In re AN.C.

In re Sh.C.

In re St.C.

S.W., Appellant.

Nos. 96–FS–1195, 96–FS–1196, 96–FS–1258.

District of Columbia Court of Appeals.

Argued Sept. 3, 1998.

Decided Dec. 30, 1998.

James G. Walker, Washington, DC, for appellant S.W.

T. Michael Barry for appellees.

John W. King, Washington, DC, filed a statement in lieu of brief for A.C.

Jo Anne Robinson, Principal Deputy Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for the District of Columbia.

Before WAGNER, Chief Judge, SCHWELB, Associate Judge, and KING, Senior Judge.[*]

SCHWELB, Associate Judge:

On August 8, 1996, following a contested fact-finding hearing, the TPR judge [1] issued an order terminating the parental rights (TPR) of the father (S.W.) and the mother (A.C.) with respect to their three minor children, respondents Sh.C (born April 23, 1988), St.C., Jr. (born February 23, 1991) and An.C. (born February 23, 1992). On appeal, the father contends that the TPR petition was prematurely filed and that the trial judge gave inadequate consideration to an alternative placement proposed by the father. We affirm.

## I.

On August 10, 1993, a fact-finding hearing was held before the neglect judge on a petition by the Office of Corporation Counsel alleging that both parents had neglected the three respondents. At the conclusion of the hearing, the judge orally found that each respondent was a neglected child. Entries to that effect were made on each respondent's jacket. On October 4, 1993, the neglect judge entered written disposition orders reflecting that each child "has been found to have been neglected and in need of protection pursuant to D.C.Code § 16–2301(9)(B), (C) and (F)," and committed the children to the Department of Human Resources. The neglect judge did not, however, enter his written Findings of Fact, Conclusions of Law, and Order finding the children to be neglected, until July 25, 1996, three days after the TPR judge had held a hearing on the motion of the children's guardian *ad litem* (GAL) to terminate the parental rights of both parents.

---

[*] Judge King was an Associate Judge, Retired at the time of argument. His status changed to Senior Judge on November 23, 1998.

[1] In 1993, Honorable Wendell P. Gardner, Jr. held that the three respondents were "neglected" children. We refer to him as the "neglect judge." In 1996, Honorable Mary Ellen Abrecht ordered that the parental rights of the children's father and mother be terminated. We refer to her as the "TPR judge."

■ The GAL's TPR motion was filed on December 1, 1995. The District's TPR statute provides, with exceptions not here applicable, that such a motion "may be filed only when the child who is the subject of the motion has been adjudicated neglected at least six months ...." D.C.Code § 16–2354(b) (1997). The father now contends that the GAL's petition was premature. The father relies on Super. Ct. Neg. R. 16(b) (1998), which provides in pertinent part that "[a] finding of neglect shall be supported by a preponderance of the evidence, and shall be accompanied by a written statement of the specific facts on which the finding is based ...." The father points out that the neglect judge's written findings were not entered until seven months after the TPR motion was filed. He claims that the children therefore were not "adjudicated neglected" within the meaning of § 16–2354(b) until the neglect judge's written findings were entered, and that the TPR motion could not properly be filed until January 25, 1997, six months after the entry of these written findings.

■ The TPR judge rejected the father's contention, both as a matter of construction of the applicable statute and Rule,[2] and because the parents had failed to raise the issue in timely fashion.[3] The judge concluded that

> the parents' current contention is unfounded and, in any event, has been waived by their previous acquiescence. Moreover, the children's need for stability and permanency should not be delayed because of the court's delay in complying with a rule where no one was prejudiced.

2.  The judge wrote as follows:
    Nothing in the language of either the rule or the statute supports the parents' argument that the adjudication and disposition is invalid until detailed factual findings are made in writing. A child's neglect adjudication and placement is immediate, even if there is a delay in filing of the written reasons. The adjudication and disposition are distinct from the written statement of reasons.

3.  After noting that the disposition order stating that the children had been found to be neglected was issued on October 4, 1993, the TPR judge stated:

We agree with the judge's analysis. The adjudication of neglect in these cases occurred in August 1993, when the first trial judge's oral findings were entered on the jacket, and not in 1996, when the judge formally issued his written findings of fact. The parents' objection to the lack of any written findings was not raised at the appropriate stage of the proceedings, and the defect could readily have been cured if a timely objection had been made. *See, e.g., Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) (contentions not timely raised in the trial court are normally spurned on appeal).

## II.

This case began in 1992, after two citizens acting as "good Samaritans" reported that the parents, both of whom were abusing unlawful drugs, were repeatedly engaged in panhandling on the street. The children, the youngest of whom was only a few months old, were with the parents. The neglect judge subsequently found that the children were "filthy, unwashed, malodorous, and ravenously hungry." The judge concluded that "[t]he children were deprived of food, clothing, shelter, and emotional security and stability not due to lack of financial resources."

In November 1992, the two girls, Sh.C. and An.C., were placed in the home of their foster mother, S.H., a licensed day care provider. The boy, St.C., Jr., was placed in the same home in January 1993. The ages of the respondents at the time that they began to live with the foster mother were as follows:

> No complaint was made that the Division had not yet filed detailed written findings and no appeal was noted. Thereafter, the court held reviews every six months and the parents never complained or brought to the court's attention the absence of written reasons for the neglect adjudication. The motion to terminate parental rights was filed on December 1, 1995. Neither parent filed any objection to its filing or filed any motion to dismiss based on jurisdiction. The issue of the absence of written reasons was first raised by the court itself during the hearing on the motion for termination.

| Sh.C. | four years, seven months |
| An.C. | nine months |
| St.C., Jr. | two years |

Each respondent has now resided in the foster mother's home for approximately six years. The younger children have no recollection of living with anyone other than S.H. The older girl, who has lived more than half of her life with the foster mother, regards S.H. as her mother. She recalls the time before S.H. as a "bad time."

After the children were removed from the custody of the parents, neither the father nor mother took any appreciable interest in them. There has been very little visitation. The father and the mother were offered parenting classes and other services, but each parent failed to follow through. In her order terminating parental rights, the TPR judge found:

> These children need a timely integration into a stable and permanent home. Neither parent is able to provide a stable home at this time. [The father] is serving five years' incarceration on a robbery conviction and does not expect to be eligible for parole for at least two years. [The mother], although in the community, has made no effort to achieve reunification with her children. From 1993 to 1995, while the children were becoming bonded with their foster mother, neither parent had any alternative plan for care of the children.

The foster mother has expressed an interest in adopting the three respondents, and she wishes to make her home a permanent home for them.[4] The children are now firmly bonded with her and well cared for in her home. At the TPR hearing, the GAL presented the expert testimony of a clinical psychologist, who opined that separation of the children from the foster mother would be detrimental to the children "because of the very strong bond the respondents have with [her] and the absence of close attachment to any relative."

After a painstaking analysis of the record in terms of each of the relevant criteria set forth in our TPR statute,[5] the TPR judge found "by clear and convincing evidence that termination of parental rights of [the mother] and [the father] is in the best interest of the children to free them for adoption that awaits them."

### III.

██ The moving party in a TPR case must demonstrate by clear and convincing evidence that termination of the parent and child relationship is in the best interest of the child. D.C.Code § 16–2359(f). The trial court's factual findings must be sustained unless they are clearly erroneous. *In re L.W.*, 613 A.2d 350, 359 (D.C.1992). The judge's determination whether the applicable standard has been satisfied is reviewable only for abuse of discretion, and the judge has wide latitude in applying the statutory criteria. *In re A.R.*, 679 A.2d 470, 474 (D.C. 1996) (citations omitted).

---

**4.** The foster mother suffers from diabetes and, in early 1995, she became ambivalent about her ability to care for the children. The foster mother succeeded in losing ninety-five pounds, however, and her diabetes has been brought under control. The TPR judge found that the foster mother "is now certain of her desire to adopt."

**5.** The appropriate inquiry is mandated by D.C.Code § 16–2353(b), which provides in pertinent part as follows:

> (b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
>
> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
>
> ....
>
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
>
> (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided ....

The father cannot and does not claim that the TPR judge's findings lack adequate support in the record. He asserts, however, that the judge "did not take into account the father's wishes that he wanted his children to live with either his mother or his sister until he was released from prison." Relying on this court's opinion in *In re T.J.*, 666 A.2d 1 (D.C.1995), *petition for reh'g en banc denied*, 675 A.2d 30 (D.C.), *cert. denied*, 517 U.S. 1028, 116 S.Ct. 2571 (1996),[6] the father contends that "the TPR should not have been granted, and that the children should have been placed with the paternal grandmother or the paternal aunt forthwith."

Contrary to the father's assertion, however, the TPR judge gave thoughtful consideration to the father's preferences. Indeed, she addressed the issue in some detail, and we quote from her findings at length:

> The birth parents did not suggest [the paternal grandmother] as a possible caretaker until February of 1995 after the children had already been in foster care with [the foster mother] for more than two years. The parents now want the Court to sever those strong ties. The attachment to [the foster mother] was formed because of parental neglect and inaction for over two years. The absence of attachment to birth parents and other blood relatives was a result of the birth parents' failure to notify or involve those relatives for over two years. Whatever preference would have been given to the parents' choice of related caretakers in early 1993 should not be afforded them in 1996 given the absence of timely involvement. [The paternal grandmother's] involvement has not only been untimely, it has not been frequent. Although DHS stalled in arranging visits for [the paternal grandmother] for a month or two in 1995, [she] began visiting her grandchildren under DHS supervision in March 1995. Once DHS supervision was removed and [the paternal grandmother] was free to initiate requests for visits directly with [the foster mother] she took no initiative. [The foster mother] called [the paternal grandmother] and proposed several Saturday visits which did occur; but [the paternal grandmother] never requested more. At the time of the hearing in late July, she had only seen the children twice in 1996.

> The children enjoy seeing their grandmother, but placement with her and removal from [the foster mother] is not in their best interests. [The paternal grandmother] has no realistic long term plan for them. She says she wants them to join her immediately but has only a one bedroom apartment which she already shares with a friend. She would give the two girls and one boy the bedroom, while she slept in the living room. Plans for a larger space as they get older have not been made. She is employed and not presently receiving public assistance. Understanding that care of the Respondents might entitle her to government assistance in obtaining larger living quarters, with the help of DHS, she applied for public housing in July 1995. Although she was told that the process could take a couple of years and that she had to renew her application each year on her birthday, she did not renew. On her birthday in March of 1996, she forgot to renew and therefore must start all over. She has not looked for larger units in the private sector because she thinks her one bedroom unit is adequate.

The foregoing passage reveals that inaction on the part of the parents, as well as their apparent lack of interest in the children, brought about the bonding between the foster mother and the children which the father is now asking the court to undo. That bonding, however, is now a fact of life. At least at the time of the TPR hearing, on the other hand, the paternal grandmother had

---

6. In *T.J.*, the court summarized its holding as follows:

> [U]nless it is established that the parent is not competent to make such a decision, a child and the natural parents share a vital interest in preventing erroneous termination of their natural relationship, and, therefore, a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest.

666 A.2d at 11.

demonstrated little or no initiative, and she was in no position to provide the three children with a permanent home.[7] If the motion for a TPR had been denied, then the children's sense of security with the foster mother would have been supplanted by uncertainty and doubt.

■ "Courts will not gamble with a child's future." *In re Application of L.L.*, 653 A.2d 873, 887 (D.C.1995) (citation and internal quotation marks omitted). Indeed, it is generally contrary to a child's best interest "to take a child out of a loving home, when she ha[s] lived at that home for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her." *Id.* at 883 (citations omitted).[8]

The TPR judge correctly noted that "these children ... have been in limbo for four years (most of their lives). ..." She therefore urged expedition in further proceedings in this case. We agree with the judge. "Legislatures and courts alike have recognized that, in the words of one commentary, 'no child can grow emotionally while in limbo. He cannot invest except in a minimal way ... if tomorrow the relationship may be severed.'" *L.L.*, *supra*, 653 A.2d at 887 (quoting M. Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 STAN. L. REV. 985, 995 (1975)) (quoting BRYCE & EHLERT, *144 Foster Children*, 50 CHILD WELFARE 499, 503 (1971)). The TPR judge could properly conclude that if the parental rights of the father and the mother were not terminated, the children's future would be completely unsettled, and they would have to "wait and see" whether placement with a blood relative could be arranged at some unspecified time in the future. Given the long history of this case, we agree that a "wait and see" option is no longer viable. *See L.L.*, *supra*, 653 A.2d at 887–89. Although, as we held in *T.J.*, the wishes of a fit parent as to the custody of his or her child constitute an important factor in the judge's calculus, the TPR judge could rationally find, and she did find, that in this case the father's statement of preference came far too late, that the proposed alternative placements were unrealistic, and that further delay would be detrimental to the children's well-being.

The TPR judge devoted a great deal of thought and attention to this case. She listened carefully to the testimony and to the contentions of all parties. The judge recognized the sensitivity of the issues before her and resolved them thoughtfully and conscientiously. We discern no abuse of discretion or legal error.

■ *Affirmed.*[9]

----

7. The father's sister also testified at the hearing. She claimed that she was ready to take the three children, as well as a fourth child of the father, into her own home. The aunt, who was unemployed, lived in a two-bedroom apartment. As the judge commented at the hearing, the aunt, who had five children of her own, was ostensibly "willing to have nine children [in the two-bedroom unit], all the boys in one room, all the girls in another." The aunt testified that she would sleep "in the living room in a let-out sofa." The judge could reasonably find that this belated offer was unrealistic, and that the aunt's testimony did not justify further delay in assuring a permanent home for the children.

8. The Supreme Court of Pennsylvania has described the removal of a child under such circumstances as "ruthless beyond description."

*In re Hazuka's Adoption*, 345 Pa. 432, 29 A.2d 88, 90 (Pa.1942); *see also L.L.*, *supra*, 653 A.2d at 883 (quoting *Hazuka's Adoption*).

9. The father also challenges the termination of his parental rights on the ground that he was not served with the original neglect petition and therefore did not personally attend the neglect hearing. The neglect judge stated in his order, however, that the father had notice of the proceedings, having apparently been served in court by the social worker. The father's court-appointed counsel was present at the neglect hearing to protect his client's interests. In spite of his incarceration, the father was present at the TPR hearing and testified on his own behalf. No appeal was taken from the adjudication of neglect, and his attempt to challenge that adjudication collaterally, years after the fact, comes far too late.