964 A.2d 595 (2009)
In re Petition of T.W.M.;
T.B., Appellant; and
S.E., Appellant.
Nos. 06-FS-1537, 06-FS-1552.
District of Columbia Court of Appeals.
Argued October 30, 2008.
Decided February 5, 2009.
*597 Stephen L. Watsky for appellant, T.B.
Joanne Schamest for appellant, S.E.
Larry Banks Blackwood, Guardian Ad Litem, for T.E.
Sanya Sukduang, with whom Timothy B. Donaldson was on the brief, for appellee, T.W.M.
Linda Singer, Attorney General for the District of Columbia at the time the statement was filed, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Catherine Ferrando, Assistant Attorney General, filed a statement in lieu of brief, for the District of Columbia.
Before WASHINGTON, Chief Judge, and FISHER and BLACKBURNE-RIGSBY, Associate Judges.
WASHINGTON, Chief Judge:
Appellants T.B. and S.E., the natural parents of T.E. ("the child"), appeal the Superior Court's order granting the adoption petition of T.W.M., the child's foster mother, and denying the competing adoption petition of A.E., T.E.'s second cousin and the natural parents' choice of caregiver for the child. We reverse and remand.

I.

BACKGROUND

A. Neglect Determination & Foster Care
T.E. was born prematurely on October 9, 2001, to Appellants T.B. (the father) and S.E. (the mother). S.E. left the child at the hospital, and on November 29, 2001, T.E. was placed in foster care. S.E. was not able to care for the child due to her substance abuse problems, so she was allowed only two-hour weekly supervised visits with T.E. On November 30, 2001, a *598 petition was filed alleging that T.E. was a neglected child pursuant to D.C.Code §§ 16-2301(9)(B) and (C) (1997 Repl.).[1] On January 31, 2002, S.E. stipulated to neglect pursuant to D.C.Code § 16-2301(9)(C). T.B. did not participate in the neglect proceedings, as he was incarcerated at the time and did not appear before the neglect judge.
Following a Disposition Hearing, on January 15, 2002, the neglect judge placed T.E. in her mother's protective supervision while she participated in the Nurture for Life ("NFL") drug treatment program. The NFL program provided S.E. with housing, substance abuse therapy, parenting classes, and General Equivalency Diploma (GED) study courses. S.E. absconded from the program in October 2002, leaving T.E. behind. Subsequently, the child was placed in foster care with her maternal aunt, who was already caring for several of T.E.'s siblings.
On October 18, 2002, at a Permanency Hearing, the neglect judge committed T.E. to the Child and Family Services Agency ("CFSA") and determined that she should remain in her maternal aunt's custody. The neglect judge also allowed Appellants supervised visits with T.E. and set forth certain criteria with which S.E. and T.B. had to comply if they wished to regain custody of T.E. Subsequently, on November 21, 2002, T.E. was removed from her maternal aunt's care and placed in foster care with T.W.M.

B. A.E.'s Involvement
Shortly after T.E. was placed into foster care with T.W.M., A.E., T.E.'s second cousin, contacted CFSA about getting custody of the child. A.E. is a divorcee[2] and single mother with a stable job. CFSA arranged supervised visits between A.E. and T.E., which began January 18, 2003.[3] A.E. consistently met with the child whenever the visits could be arranged.
A.E. and T.E. developed a good relationship, as did T.E. and A.E.'s young son. A.E. took the child to festivals, family gatherings, various sporting events, and the circus. A.E. enrolled her in gymnastics classes, and bought clothing and shoes for T.E.
On March 13, 2003, the permanency goal for T.E. was changed from reunification to adoption by A.E., and on May 5, 2003, the court ordered unsupervised, overnight weekend visits between A.E. and T.E. A.E. picked up the child from CFSA Saturday *599 mornings and returned her on Sunday evenings.
On August 1, 2003, T.B. executed a Consent of Biological Parent ("consent") to the adoption of T.E. by petitioner A.E. On September 3, 2003, T.W.M., T.E.'s licensed foster mother, filed a petition to adopt T.E. The father's consent to adoption was filed September 16, 2003, and three months later S.E. joined T.B. in consenting to the adoption of T.E. by A.E., although S.E.'s consent was not filed until January 13, 2004.

C. The Hair Episode
During a Permanency Hearing on November 16, 2004, before the Honorable Odessa Vincent, A.E. suggested that T.W.M. had improperly cut parts of T.E.'s hair, while T.W.M. asserted that the child's hair loss was due to A.E. braiding her hair too tight. In support of her allegation, T.W.M. presented to the trial court a report from T.E.'s physician dated March 23, 2004, which indicated that the child's hair was being braided too tight. After viewing T.E.'s scalp in court, the trial court ordered that the child's hair only be loosely braided and not put in tight braids like cornrows.
In December 2004, T.W.M. noticed that T.E. was suffering from blisters and pimples on her scalp. On January 7, 2005, T.W.M. argued to the trial court that T.E.'s reaction was a result of someone tightly cornrowing the child's hair again, in violation of the court's November 16th order. Based on the representation by T.W.M., the trial court placed visitation restrictions on A.E. until the matter could be resolved. On February 15 and 16, 2005, the trial court held an evidentiary hearing on the hair issue, during which both petitioners testified. After the hearing, the trial court ordered both petitioners to cease doing T.E.'s hair, and it further ordered that only a particular professional hair stylist handle T.E.'s hair needs.
On May 3, 2005, Judge Vincent received a letter from the selected stylist alleging that someone other than she had braided, and cut or shaved, T.E.'s hair. At a Status Hearing held two days later, both petitioners denied knowledge of, or responsibility for, T.E.'s hair loss. Despite the petitioners' attestations that they had not violated the court's order, Judge Vincent removed the child from T.W.M.'s home and placed her in another foster home until the court issued its final decision on the adoption petitions in April 2006. During that period of time, the petitioners were only allowed supervised visits with T.E.

D. Trial on Adoption Petition
After the competing adoption petitions were consolidated, Judge Vincent oversaw a four-day trial, which began on September 29, 2005. Both petitioners testified. S.E. and T.B. testified in support of A.E.'s petition for adoption, as did at least three social workers assigned to T.E.'s case.
The social workers believed that either A.E. or T.W.M. would be a good caregiver for the child; but in the interest of maintaining familial relationships, they opined that placing the child with A.E. would be in T.E.'s best interest. Because none of the social workers offered compelling evidence that would distinguish the two petitioners in terms of ability to parent T.E., the court appeared to give more consideration and weight to the experts' testimony.
The first expert, Child Psychiatrist Floyd B. Galler, testified about his February 2005 psychiatric evaluation of T.E. and both petitioners. After separately observing both petitioners with T.E. for approximately one-half hour each, Dr. Galler determined that A.E.'s parenting skills were *600 not particularly good, especially as compared to T.W.M.'s parenting skills which he deemed superior. However, the doctor further testified that, based on his attachment study, T.E. saw A.E. as her "psychological parent"  the person T.E. essentially felt she wanted to take care of her. Dr. Galler admitted that he questioned his own conclusion since T.E. had spent most of her life with T.W.M., while the child had only spent a limited amount of time with A.E. However, after mulling the matter over in a very interesting critical self-examination on the stand, the doctor concluded that his opinion supporting A.E.'s adoption petition was sound.
Another expert, Dr. Roselyn E. Epps, Chief of Dermatology at Children's National Medical Center, was called to testify regarding T.E.'s scalp conditions. Dr. Epps had examined T.E. on July 13, 2005, and diagnosed the child as having tinea capitis, a scalp fungal infection, and alopecia areata, a hair loss condition. The doctor did not opine on the cause of T.E.'s scalp conditions, noting that her blistering and hair loss could have been caused by any number of things, including stress or bacteria. And since the cause of both scalp conditions was unknown, Dr. Epps was unable to say with certainty whether it was the braiding, or other conduct, causing T.E.'s scalp problems. However, the doctor did note that both conditions were common and treatable with medication.
The Guardian ad Litem ("The Guardian") did not testify at the trial. But shortly after the trial concluded on October 25, 2005, the Guardian submitted to the trial court a recommendation in favor of A.E.'s petition for adoption. In the Guardian's recommendation, he factually summarized the circumstances of both petitioners and determined that they were both qualified and generally comparable, but he ultimately favored A.E. over T.W.M. given A.E.'s age and family structure.
On May 19, 2006, after the trial concluded, the trial court ordered CFSA to place T.E. with T.W.M. and to terminate contact between A.E. and T.E. Six months later, on November 22, 2006, the trial court issued an order denying A.E.'s adoption petition and granting T.W.M.'s competing petition.

E. Trial Court's Order
After hearing all of the evidence, the trial court made several significant factual and legal findings in its Memorandum and Order entered November 22, 2006. First, in its findings of fact, the trial court credited the testimony of Dr. Epps, and concluded that T.E.'s scalp irritation and hair loss was due to her naturally occurring scalp conditions. But because the cause of T.E.'s scalp condition was inconclusive, the trial court independently concluded that T.E.'s scalp conditions were exacerbated by A.E.'s practice of tightly braiding T.E.'s hair.
With respect to the psychiatric evaluation of A.E., the trial court rejected Dr. Galler's conclusion that A.E. was T.E.'s "psychological parent", because Dr. Galler did not use the same procedures for evaluating T.E. with T.W.M. as he did when evaluating T.E. with A.E., and he did not use additional procedures to confirm his initial conclusions. Further, according to the trial court, Dr. Galler's conclusions were questionable because there was some indication that T.E. had an "as if personality"i.e., she learned to get along wherever she was and became attached to whomever the caregiver was at the time.
The trial court concluded as a matter of law that Appellants' choice of caregiver for T.E. was not entitled to deference because the parents had failed to grasp their opportunity interest in raising T.E. However, *601 the trial court alternatively concluded that, even if Appellants' chosen caregiver was entitled to deference, A.E. was not a fit custodian for T.E. because she possessed deficient parenting skills, lacked moral soundness, and physically abused T.E. by braiding her hair too tightly. Based on the above findings of fact and conclusions of law, the trial court granted T.W.M.'s petition for adoption.[4] T.B. and S.E. timely appealed.[5]
On appeal, the natural parents contend that the trial court erred by failing to give their choice of caregiver, A.E., weighty consideration; and to the extent that it gave A.E. sufficient consideration, Appellants argue that the trial court abused its discretion by granting T.W.M.'s adoption petition because it erred in finding that A.E. was not a fit caregiver for T.E.

II.

STANDARD OF REVIEW
"We review the trial court's order granting adoption for abuse of discretion, and determine whether the trial court `exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.'" In re T.J., 666 A.2d 1, 10 (D.C.1995) (quoting In re Baby Boy C., 630 A.2d 670, 673 (D.C.1993)). In that review, we assess whether the trial court applied the correct standard of proof, and then evaluate whether its decision is "supported by substantial reasoning drawn from a firm factual foundation in the record." Id. (quoting In re D.I.S., 494 A.2d 1316, 1323 (D.C. 1985)).

III.

ANALYSIS

A.
As an initial matter, the trial court concluded that Appellants had forfeited their right to have their chosen caregiver receive weighty consideration because they failed to grasp their "opportunity interest", in this regard, by failing to properly parent the child. The trial court's conclusion, however, is not supported by our prior decisions.[6] In cases *602 involving placement of a child, we have held that "a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest." T.J., supra, 666 A.2d at 11 (emphasis added).[7] Our holding in T.J. is premised on the notions that natural parents have a "fundamental liberty interest . . . in the care, custody, and management of their child[ren]" and they do not lose their constitutionally protected interest in influencing their child's future "simply because they have not been model parents or have lost temporary custody of their children." Id. at 11-12 (quoting Santosky, supra, 455 U.S. at 753, 102 S.Ct. 1388). Parental liberty interests are fundamental, not fleeting; and we will not deny constitutional deference accorded to parents merely because their blood relationships are strained or parenting skills are poor. See Santosky, supra, 455 U.S. at 753, 102 S.Ct. 1388. Certainly, natural parents lose their fundamental interests in dictating their child's future upon a formal termination of parental rights. D.C.Code § 16-2361 (2008) (divesting parents of all legal rights, powers and privileges relating to child and eliminating parent's right to participate in adoption); see In re A.T.A., 910 A.2d 293, 297 n. 3 (D.C.2006) (mother had no right to have her chosen caregiver receive weighty consideration because her parental rights had been properly terminated). However, as long as natural parents' parental rights remain intact, their indiscretions or parenting failures alone will not act to automatically sever their right to join in decision-making related to the rearing of their child. See Santosky, supra, 455 U.S. at 753, 102 S.Ct. 1388; see, e.g., In re C.T., 724 A.2d 590 (D.C. 1999) (father facing termination of parental rights ("TPR") was entitled to have his caregiver preference given sufficient consideration); In re F.N.B., 706 A.2d 28, *603 31-32 (D.C.1998) (mother facing TPR allowed to choose preferred caregiver although she was unable to parent due to substance abuse problems); T.J., supra, 666 A.2d at 12 (mother's choice entitled to weighty consideration although she was unable to parent child due to mental illness). Thus, to conclude that natural parents forfeit their fundamental parental interests because they are unable to parent their child, is a rationale that runs contrary to our precedent.
Here, Appellants neglected the child, and they do not dispute that they had little relationship with her. Furthermore, Appellants admit that their inability to care for T.E. personally, is largely due to self-inflicted infirmities, namely incarceration and substance abuse. But regardless of their infirmities, their parental rights had not been terminated at the time they selected a caregiver for T.E. Because their parental rights were intact at the time of the adoption proceeding, Appellants had not forfeited their right to choose a caregiver for T.E. merely because they were unfit to personally parent the child.[8] By concluding otherwise, the trial court failed to properly consider natural parents' rights to direct their child's future through choosing a fit caregiver; and it was an error to find that Appellants had forfeited these rights due to their own dereliction. See T.J., supra, 666 A.2d at 14; see also C.T., supra, 724 A.2d at 598 (reversing and remanding where trial court failed to give requisite weighty consideration to neglectful parent's preference that children be placed with cousin); F.N.B., supra, 706 A.2d at 33 (reversing and remanding for trial court to sufficiently consider mother's choice of custodian before terminating her parental rights). Therefore, Appellants' chosen caregiver was entitled to weighty consideration.[9]

B.
Notwithstanding its initial conclusion, the trial court subsequently determined that even had it given Appellants' chosen caregiver, A.E., weighty consideration, placement of the child with T.W.M. was in T.E.'s best interest because A.E. was not a fit custodian. The record, however, *604 does not support the trial court's conclusion that placing T.E. with A.E. would be contrary to the best interest of the child. Therefore, the trial court's decision denying A.E.'s petition in favor of T.W.M's petition was an abuse of discretion.[10]
"Where the parents have unequivocally exercised their right to designate a custodian, [ ] the court can `terminate' the parents' right to choose only if the court finds by clear and convincing evidence that the placement selected by the parents is clearly not in the child's best interest[.]" T.J., supra, 666 A.2d at 16. Thus, under the standard as articulated in T.J., in a case where there are competing petitions for placement of a child and one of the petitioners is favored by the natural parent, the party without the parent's consent has the burden of establishing by clear and convincing evidence that placing the child with the parent's preferred caregiver is contrary to the child's best interest. Id. In light of this standard and the evidence adduced at trial, we conclude that T.W.M. failed to establish by clear and convincing evidence that placing T.E. with A.E. was clearly contrary to T.E.'s best interest.
While we are loath to second guess a trial judge who has heard the evidence and is much closer to the situation than we are on appeal, nothing in our review of the record suggests that A.E. would not have been a fit caregiver for T.E. In fact, the record confirms that A.E. had a stable job that allowed her to provide for the child, and she eagerly sought to care for her. A.E. displayed an early interest in T.E., and she was committed to being in the child's life. Immediately after A.E. was awarded unsupervised weekend visits with T.E., A.E. became actively involved in the child's life, enrolling her in extracurricular activities and taking her to various social events. A.E. also introduced T.E. to her extended family, giving the child an opportunity to build a relationship with her relatives. And through her interaction with A.E., T.E. developed a very strong sibling-like relationship with A.E.'s son. Moreover, there is evidence in the record that A.E. was more than willing to undertake the steps necessary to provide for T.E., including secure a loan to purchase a larger home in anticipation of T.E. coming to live with her. Finally, the CFSA social workers assigned to T.E.'s case all unequivocally endorsed A.E.'s adopting T.E. Based on this evidence, we have no trouble concluding that A.E. was a fit caregiver for T.E.
Instead of weighing the factors critical to determining whether A.E. was a fit caregiver for T.E., the trial court focused on collateral matters to support its conclusion that there was clear and convincing evidence of A.E.'s unfitness to parent T.E.[11] For instance, the trial court asserted that A.E. was "physically abusive" to T.E. because it concluded that A.E.'s braiding the child's hair tightly in cornrows caused her to develop blisters on her scalp and lose hair. Dr. Epps testified that T.E. had two scalp conditions, and her blisters and hair loss could have been caused by a number of things other than braiding, including stress and bacteria. Nothing was offered to contradict the doctor's testimony. When looking at whether *605 an adoption petitioner would serve in the child's best interest, a trial court may consider "any factor which appears relevant under the circumstances to allow the judge to make an informed and rational judgment." See In re D.R.M., 570 A.2d 796, 804 (D.C.1990) (discussing the "elastic nature" of the best interest of the child standard). However, to consider that which is not supported by clear and convincing evidence, is improper. Thus, the trial court's conclusion here was in error.
The trial court also concluded that A.E. had deficient parenting skills based on a bonding study conducted by Dr. Galler, which noted that A.E. was too intrusive in T.E.'s play during playtime. The trial court, however, failed to consider that, despite Dr. Galler's findings (which were based on a single half-hour observation of T.E. and A.E.), Dr. Galler still unequivocally endorsed A.E. to adopt T.E. because of the strong bond between the two. Given this endorsement, A.E.'s parenting skills could not have been so poor as to make her parenting clearly contrary to the child's best interest.[12]
The trial court also found A.E. unfit because she concealed her marital status on her adoption petition and during the initial adoption proceedings.[13] The trial court condemned A.E.'s non-disclosure as evidence of "deficient moral character." We find it particularly odd that before trial the trial court was not so bothered by A.E.'s non-disclosure that it exercised its authority to allow her to correct her petition, yet at trial it ultimately denied her petition because of the initial non-disclosure. We note that A.E. was divorced well before the date of trial, and so A.E.'s former-husband, with whom she had never lived and with whom she had barely any contact, was not a particularly relevant factor in determining whether she was a fit caregiver for T.E.
We certainly do not condone adoption petitioners deliberately concealing information from the trial court or CFSA. See In re M.L.P, supra, 936 A.2d at 322-24 (affirming trial court's dismissal of adoption petition in competing adoption where foster mother deliberately concealed marital status). And we concede that an adoption petitioner's moral fitness may be relevant to determining whether he or she would serve in the child's best interest. But we cannot conclude on the facts of this case, that A.E.'s concealment of her marital status was clear and convincing evidence that placing T.E. with her was contrary to T.E.'s best interest, particularly in light of the evidence adduced at trial that A.E.'s former husband had been incarcerated for almost the entirety of their marriage and that A.E. had been granted a divorce well before the trial court's ruling in this case. The trial court should not have denied A.E.'s adoption petition absent sufficient showing that placement with her was clearly contrary to T.E.'s best interest.
Accordingly, the trial court abused its discretion in denying A.E.'s petition for adoption and granting T.W.M.'s *606 petition. Despite reaching that conclusion, however, this court is not in a position to order the trial court to grant A.E.'s petition for adoption because A.E. failed to appeal from the trial court's order and because several years have passed since the trial court ordered that the relationship between A.E. and T.E. be terminated. Perhaps A.E. is no longer interested in adopting T.E.; even if she is, she may be precluded by principles of res judicata from seeking to do so. Given the passage of time, it may be in the child's best interest that she remain with T.W.M. Nevertheless, Appellants were prejudiced because the trial court's decision misapplied the law relating to their designation of a custodian for their child, and the adoption decree terminated their parental rights. The matter of T.E.'s adoption must be considered anew. For these reasons, it is:
ORDERED that the trial court's judgment terminating parental rights, denying A.E.'s adoption petition and granting T.W.M.'s adoption petition is reversed and the case is remanded to the trial court with instructions to vacate the order. It is
FURTHER ORDERED that the trial court issue an order to reinstate the neglect case and determine anew whether T.B. and S.E. consent to the adoption by T.W.M. or whether they are withholding their consent against the best interest of T.E.
So ordered.
NOTES
[1] In relevant part, D.C.Code § 16-2301(9) states:

The term "neglected child" means a child:
(A) who has been abandoned or abused by his or her parent, guardian or custodian; or
(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or
(C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization or other physical or mental incapacity.
[2] A.E. married in June 1993, at the age of 21, and the couple had a child shortly thereafter. Her husband was arrested a few months after they were married, and he was later convicted of multiple counts of armed robbery. After he began serving a lengthy prison sentence, A.E. estranged herself from her husband, serving only as a communication conduit between him and their son. She finally divorced him in October 2004. However, when A.E. sought foster home certification in 2000 and when she petitioned for adoption of T.E. in May 2003, she indicated that she had never been married.
[3] On January 27, 2003, the permanency goal for T.E. was changed from reunification to guardianship after Appellants failed to comply with the neglect judge's orders.
[4] In the final section of its order, the trial court by and large dismissed the Guardian and social workers' recommendations favoring A.E.'s adoption petition because, as the trial court concluded, the Guardian and social workers favored A.E. adopting T.E. solely because it would preserve familial relations.
[5] We note that A.E. did not appeal the trial court's order denying her adoption petition. Furthermore, although the Guardian filed a brief contesting the trial court's order, the Guardian did not comply with our procedures by filing an appeal; therefore, the Guardian's brief was not considered.
[6] The trial court misapplies the concept "grasping opportunity interest" here as it misses the point of our decision in Appeal of H.R., 581 A.2d 1141 (D.C. 1990) and misapplies the opinion's language in the process. In H.R., a trial court erroneously denied a noncustodial father custodial preference as a natural parent in an adoption proceeding, and the adoption was granted over the father's objection. H.R., supra, 581 A.2d at 1143. We held that a noncustodial father's interest in developing a custodial relationship with his child will be entitled to substantial protection if he has grasped his opportunity interest  i.e., he has "early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue his interest in the child." Id. at 1163. The parental interest asserted in H.R. is wholly different than the interest asserted by Appellants here. In H.R., the interest at issue concerned a noncustodial natural parent's right to assume custody of his child and prevent permanent termination of his parental rights. As we determined in H.R., a parent may exercise this custodial interest depending upon factors which relate to that parent's pursuit of the child and involvement in his or her life. Id. at 1162 (noting five factors including the custodial, personal, or financial relationship with the child). The issue at present regards natural parents' interests in dictating their child's future before they voluntarily terminate their parental rights. This exercise of interests does not hinge on the quality of the parents' involvement in the child's life or the parents' custodial relationship with the child. We reiterate, that parents whose parental rights are intact do not lose the right to have their choice as to their child's adoption or guardianship being accorded substantial weight "simply because they have not been model parents or have lost temporary custody of their children." T.J., supra, 666 A.2d at 12 (quoting Santosky, supra, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Accordingly, the parental interests asserted in the two cases do not align. Accordingly, H.R.'s concept of "grasping opportunity interest" has no place here.
[7] We first articulated and applied the "weighty consideration" concept in T.J., a case involving two parties competing for custody. T.J., supra, 666 A.2d at 11. In T.J., a natural mother who was unable to care for her child due to a mental illness, chose the child's great-aunt to be his custodian caregiver so that the mother could preserve a relationship with the child. Id. at 16. Despite evidence that the great-aunt was a suitable caregiver, the trial court did not give the mother's designated custodian weighty consideration when it granted the foster mother's adoption petition over the great-aunt's custody petition. Id. Reversing the trial court's grant, we asserted that the mother, whose parental rights had not been terminated, had a "right to . . . exercise her choice of the great-aunt as custodian." Id. Moreover, we concluded that the foster mother had not met her burden as she "failed to show by clear and convincing evidence that the mother's custody choice was clearly not in the [child's] best interest." Id. Thus, the trial court could not ignore the natural mother's exercise of her parental rights, which were still intact, when such exercise was not clearly contrary to the best interest of her child.
[8] Weighty consideration does not apply in cases where parental rights have been terminated. See A.T.A., supra, 910 A.2d at 297 n. 3 (acknowledging that the trial court did not have to give weighty consideration to mother's choice because her parental rights had been terminated); see also D.C.Code § 16-2361(b) (2008) (eliminating parent's participation in adoption once parental rights are terminated).
[9] The trial court also indicated that the Appellants' choice of caregiver was not entitled to weighty consideration because it doubted that the parents sufficiently reflected upon their decision and thoroughly investigated A.E.'s fitness as a parent. While the trial court may inquire as to a natural parent's reasoning for selecting a particular caregiver, it cannot deny the parent's choice weighty consideration simply because it does not approve of his or her calculations. This is not to suggest, however, that a natural parent's reason for choosing a caregiver is irrelevant; rather, a parent's reason should be considered to the extent it impacts the best interest of the child. For instance, if a parent's reason indicates that he or she has chosen a particular caregiver because that caregiver would return the child to the parent or permit the parent to be around the child despite a court's order forbidding such interaction, the court may find that the caregiver is not in the best interest of the child in light of that reason. See, e.g., In re B.J., 917 A.2d 86, 90 (D.C.2007) (mother's preference for relative placement not in children's best interests where it would mean regular contact between children and mother who led dangerous and unstable life); In re T.M., 665 A.2d 950, 952 (D.C. 1995) (mother's choice denied where she chose relative caregiver with goal of regaining custody of child after trial court determined mother's future involvement in child's life was not in child's best interest).
[10] We need not reach the issue of whether granting T.W.M.'s petition for adoption was in the child's best interest by determining whether or not T.W.M. was a suitable caregiver for T.E.
[11] "The standard of clear and convincing proof requires evidence that will `produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" T.J., supra, 666 A.2d at 17 n. 17 (citation omitted).
[12] We also note that the trial court never inquired into the well-being of A.E.'s 10-year old son, whom she had raised on her own. Certainly, her son's situation would have shed some light on A.E.'s parenting skills beyond that which could have been observed within a brief 30-minute window.
[13] A petitioner must disclose his or her marital status as required by the adoption petition. See Super. Ct. Adopt. R. 7(b)(15) (2005). A court may sanction a party by dismissing an adoption petition if that party intentionally failed to present or knowingly misrepresented information on his or her petition. See Super. Ct. Adopt. R. 11; see also In re M.L.P, 936 A.2d 316, 322-24 (D.C.2007).