## V.

## VI.

**In re K.D. and S.D., Appellants.**

**In re K.D.; S.D.; C.C., Appellants.**

**Nos. 10–FS–753, 10–FS–826.**

District of Columbia Court of Appeals.

Argued May 24, 2011.
Decided Aug. 25, 2011.

Kevin S. Kassees, for appellants K.D. and S.D.

Ethan M. Susskind, for appellant C.C.

Chidinma M. Iwuji, Woodbridge, VA, for appellee C.M.

Dana Kaplan Rubin, Assistant Attorney General for the District of Columbia, with whom Irvin B. Nathan, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee; the District of Columbia.

Jenny Epstein, Washington, DC, Guardian Ad Litem for respondent A.S., filed a statement joining the brief of appellee District of Columbia and appellee C.M.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and PRYOR, Senior Judge.

WASHINGTON, Chief Judge:

C.C., the biological mother of minor child, A.S., along with A.S.'s biological grandparents, K.D. and S.D., challenge the adoption of A.S. by her foster mother, C.M., arguing that C.C.'s support for the Ds' petition was not given sufficient consideration. We "recognize, as we always do in such cases, that it is no small matter for a court to permit the adoption of a child over the objection of a mother who loves [her]." *In re W.D.*, 988 A.2d 456, 457 (D.C.2010) (internal quotations marks omitted). However, because appellants have not demonstrated that the trial court abused its discretion in reaching its decision, we affirm.

## I. FACTS

The minor child, A.S., was born on October 26, 2004, to C.C., the mother, who at the time was a ward of the District resid-

ing in a foster home.[1] A year later, A.S. was removed from C.C.'s custody, C.C. stipulated to neglect, and A.S. was placed into foster care. Because of C.C.'s drug use, poor performance of her court-ordered duties, and psychological diagnoses, the court changed the goal for A.S. from reunification to adoption in January of 2007. A.S. has no health concerns or special needs, and received no special services. Social workers testified that she is social, intelligent, inquisitive, resilient, and comfortable with different people. A.S. had been moved from three different foster homes before finally being placed with C.M. in July 2007. C.M. soon petitioned to adopt A.S.

At the time C.M. petitioned to adopt A.S., A.S. had lived with C.M. for almost nine months. C.M. was a fifty-two-year-old single woman with two biological children (a son, twenty-one, and a daughter, sixteen), and a two-year-old adopted daughter. The daughters lived with her, and A.S. shared a bedroom with the adopted daughter. C.M. was in good physical health, was financially stable, and had never been married but had a "boyfriend." C.M. took over custody of A.S. after participating in a long transition plan from her prior foster placement, which involved increasing visitation. A.S. called C.M. "momma" or "mommy" and referred to C.M.'s children as siblings. They enjoyed a warm, affectionate relationship.

C.C. had not met her father, K.D., until 2007, shortly before her twenty-first birthday. K.D. lives in California, and fathered C.C. with a woman who did not provide K.D.'s name for C.C.'s birth certificate and ran off with C.C. soon after she was born.

From then until K.D. was introduced to C.C., K.D. made no attempt to locate C.C. K.D. admitted that he led a "wild" lifestyle at that time, but had since changed his life. K.D. has two other children and is now married to S.D. K.D. and S.D. have no children together. K.D. owns a hauling business and is training to be a minister, and S.D. owns a fitness franchise. The couple also operates a reentry home for ex-drug abusers through their church. When K.D. was contacted by C.C., he traveled to the District to meet her and learned about A.S. (his granddaughter). Soon thereafter, K.D. and S.D. petitioned to adopt A.S., as well.

C.C. never visited the Ds in California, but was confident that A.S. would be "very well taken care of" in their household, and therefore consented to the Ds' petition. Based on her own experience in the "system," C.C. felt strongly that the biological connection would be important for A.S.'s long-term well-being. She stated that if A.S. were moved to California, she would move to California, as well, and would maintain a relationship with A.S.[2] She also stated that she believed that A.S. should be raised in a two-parent household, with a male role model.

A contested adoption trial commenced in April of 2008. The evidence at trial consisted of the testimony of C.M., the Ds, C.C., and three expert witnesses. C.M. testified that she first met A.S. while A.S. was transitioning from her previous foster placement into C.M.'s home. By the conclusion of the trial, A.S. had lived in C.M.'s home for eighteen months. C.M. tended to all of A.S.'s medical and educational needs, and A.S. followed C.M.'s directions

---

1. A.S.'s biological father is alive and has been identified, but is not relevant to the proceedings as the Magistrate Judge waived his consent to C.M.'s adoption and he did not appeal.

2. C.M. testified, however, that C.C. told her that she actually did not plan on moving to California and would prefer that A.S. stay in the District. The Magistrate Judge credited C.M.'s testimony in this regard.

and guidance. C.M. testified that A.S. also had a strong relationship with C.M.'s two-year-old adopted daughter, having learned to share space, attention, and toys with her. C.M. felt that A.S. was like a daughter to her and that she would be hurt if she could not adopt A.S. C.M. testified that if her petition were granted, she would work with C.C. and the Ds to allow them to maintain a relationship with A.S. She also testified that were the Ds' petition granted, she would work with them to ease the transition.

In support of their petition, the Ds testified that their four visits[3] with A.S. went well and that they felt as if A.S. "knew" them. S.D. testified that A.S. would easily transition into their home because of her adaptability, and because "love covers everything."

The trial court heard from three additional witnesses on the issue of which party should adopt A.S. First, A.S.'s social worker, Ms. Murphy, oversaw four ninety-minute visits between A.S. and the Ds and testified that she was pleased with how they went. According to Ms. Murphy, A.S. was initially reluctant to interact with the Ds, but eventually opened up to them. From what she knew of A.S.'s personality, having seen A.S. at least once a week since 2006, Ms. Murphy testified that this behavior was typical of A.S. meeting any new person. She stated that had the Ds started their petition earlier, and had more time to bond with A.S., perhaps she would have supported their petition. However, she noted that removing A.S. from C.M.'s care, after the child had bonded so strongly with C.M., would likely have deleterious effects on A.S. At the time of the trial, she was not sure how an appropriate transition to the Ds' home would be accomplished, given the strong bond A.S. had with C.M. versus her relative unfamiliarity with the Ds.[4]

Next, Dr. King, a clinical psychologist, who had performed a "bonding study" in July 2007 to assess A.S.'s bond with C.C., C.M., and A.S.'s previous foster parent, testified.[5] Dr. King opined that a child bonds based on the amount of time spent with a caregiver, and how that caregiver treats the child. Dr. King further testified that A.S.'s bond with C.M. was strong as evidenced by the quality of their interaction and A.S.'s reaction when C.M. left her during the exercise. He testified that placing A.S. in a home with people A.S. did not know well, like the Ds, would be quite traumatic, and stated that moving A.S. from C.M.'s home to the Ds' home would have detrimental effects that would likely be "immediate and long lasting." He testified that A.S.'s long-standing connection to a sole caregiver would make transitioning her into a new home difficult, requiring several months with no guarantee of success. He also testified that the presence of two parents in a home would make no difference in A.S.'s ability to adapt to the home, and the presence of a male role model in a child's life does not need to come from within the home, as long as the child receives quality care.

Finally, Dr. Missar testified that the methodology Dr. King used for his bonding study was sound. He noted that research does support the conclusion that a

---

**3.** The Ds initially tried to visit A.S. on one occasion and were turned away. They returned in April of 2008, the week of the adoption trial. They had two visits with A.S. then, and two more visits later on. They also communicated at least once by phone.

**4.** Ms. Murphy's testimony suggests that A.S. did not remember the Ds and had to be reintroduced to them in subsequent visits.

**5.** No bonding study was conducted with the Ds.

child can benefit from a two-parent household, and that if the choice was between two equally able caretakers, most professionals would recommend placing the child in a two-parent home. However, he also testified that while some children are more resilient than others, breaking a bond will affect the child's self-esteem and development in both the short and long term. Given A.S.'s age, Dr. Missar believed that it would not matter if the new caregivers were relatives because A.S. was too young to understand what "biological" means. He testified that in adolescence A.S. might have some identity issues growing up with a non-biological parent, but that those issues could be managed with stable and loving care.

The Magistrate Judge, in a fifty-three-page decision, found that C.C. was withholding her consent to C.M.'s adoption petition contrary to A.S.'s best interests. He considered each of the factors listed in D.C.Code § 16–2353(b) (2001),[6] and noted that the "balance overwhelmingly falls in favor of granting C.M.'s petition." With regard to C.C.'s concerns about biological family and male role models, the Magistrate Judge found that it was more important to A.S.'s development to have stability, and that a fourth move in her life would not promote stability. The Magistrate Judge concluded that A.S. is too young to understand biology, and that if A.S. had issues with her identity later in life, he was confident that C.M. would enroll her in counseling. Further, the Magistrate Judge credited Dr. King's testimony that a male role model can come from outside the home and weighed K.D.'s non-involvement in C.C.'s life until after she was emancipated from the District's care against his performance as a parent. He granted C.M.'s petition and denied the Ds'.

An Associate Judge of the Superior Court affirmed the Magistrate Judge's findings, adding little additional legal or factual analysis before concluding that the Magistrate Judge had given ample consideration to the mother's choice and that the decision was based on clear and convincing evidence. Appellants challenge this ruling.

## II. LEGAL STANDARDS

Where a parent whose parental rights are still intact "unequivocally exercise[s] [her] right to designate a custodian," her choice "must be given *weighty consideration*," and may "be overcome only by a showing, by clear and convincing evidence" that the parent's choice of custodian "is *clearly contrary* to the child's best interest." *In re T.W.M.*, 964 A.2d 595, 602 (D.C.2009) ("*T.W.M. I* ") (first emphasis in original, second emphasis added) (citing *In re T.J.*, 666 A.2d 1, 10 (D.C.1995)). "If the trial court has not given sufficient consideration to the natural parent's choice, ... we have generally reversed the trial court's decision." *A.T.A., supra*, 910 A.2d at 297.[7] With that said, it is "important to

---

**6.** Because the adoption of a child necessarily terminates the birth parents' rights to parent that child, the trial court must consider the six factors detailed in D.C.Code § 16–2353(b) (2001) for termination of parental rights. *In re A.T.A.*, 910 A.2d 293, 295 n. 1 (D.C.2006). These factors are:

(1) the child's need for continuity of care; (2) the physical, mental and emotional health of all individuals involved; (3) the quality of the interaction and interrelationship of the child with his family and care-

takers; (3A) consideration of a child's abandonment, if the child was left by his parent in a hospital located in the District of Columbia for at least 10 days following the birth of the child, and the parent's actions to maintain a custodial relationship or contact with the child; (4) to the extent feasible, the child's opinion; and (5) evidence of drug-related activity.

*Id.*

**7.** As we discussed in *T.W.M. I, supra*, this standard is "premised on the notions that

recognize that our 'weighty consideration' cases do not 'say that the parents' preferences are necessarily controlling,'" and thus the parents' choice may be overcome by the proper evidentiary showing. *In re R.E.S.*, 19 A.3d 785, 790 (D.C.2011) (quoting *In re C.T.*, 724 A.2d 590, 598 (D.C. 1999)). This means that "in a case where there are competing petitions" to adopt a child and one of the petitioners is "favored by the natural parent," the other petitioner bears "the burden of establishing by clear and convincing evidence that placing the child with the parent's preferred caregiver" would be "clearly contrary to [the child's] best interest." *T.W.M. I, supra,* 964 A.2d at 604 (citing *T.J., supra,* 666 A.2d at 16). Clear and convincing evidence is evidence "which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re W.E.T.,* 793 A.2d 471, 478 (D.C.2002) (citations omitted). However, "clear and convincing" does not mean "clear and unequivocal." *Id.*

■ "We review the trial court's order granting adoption for abuse of discretion, and determine whether the trial court 'exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.'" *T.W.M. I, supra,* 964 A.2d at 601 (quoting *T.J., supra,* 666 A.2d at 10). "In that review, we assess whether the trial court applied the correct standard of proof, and then evaluate whether its decision is 'supported by substantial reasoning drawn from a firm factual foundation in the record.'" *Id.*

## III. ANALYSIS

### A. *Whether the Trial Court Gave "Weighty Consideration" to the Mother's Preference.*

■ We note at the outset that the circumstances of this case compel us to once again remind trial courts that when a natural parent, with parental rights intact, consents to an adoption petition in a contested adoption proceeding, the trial court cannot merely weigh the competing adoption petitions against one another, as if they began in equipoise. This case came dangerously close to requiring reversal in this regard because the trial court did not make explicit findings on the issue of whether the "weighty consideration" due to the mother's choice of caregiver was overcome by clear and convincing evidence that her choice was *"clearly contrary"* to the best interests of the child. *See, e.g., T.W.M. I, supra,* 964 A.2d at 606 (emphasis added) (finding that the matter of the child's adoption "must be considered anew" where "appellants were prejudiced because the trial court's decision misapplied the law relating to their designation of a custodian for their child, and the adoption decree terminated their parental rights"); *see also R.E.S., supra,* 19 A.3d at 793 (quoting *In re Ja.J.,* 814 A.2d 923, 924 (D.C.2002) ("We have 'granted relief in [ ] cases [where] the trial court had not given sufficient consideration to the alternate custody arrangements proposed by the [parent].'")); *A.T.A., supra,* 910 A.2d at 297

natural parents have a 'fundamental liberty interest ... in the care, custody, and management of their child[ren]' and they do not lose their constitutionally protected interest in influencing their child's future 'simply because they have not been model parents or have lost temporary custody of their children.'" 964 A.2d at 602 (quoting *T.J., supra,* 666 A.2d at 11–12) (internal citations omitted). We have

recognized that "[p]arental liberty interests are fundamental, not fleeting," and "as long as natural parents' parental rights remain intact, their indiscretions or parenting failures alone will not act to automatically sever their right to join in decision-making related to the rearing of their child." *Id.* (citations omitted).

("If the trial court has not given sufficient consideration to the natural parent's choice, ... we have generally reversed the trial court's decision."). We reiterate that courts must, as a threshold inquiry, give "weighty consideration" to "a parent's choice of a fit custodian," "unless it is established that the parent is not competent to make such a decision." *T.J., supra,* 666 A.2d at 11. A natural parent's choice may be "overcome only by a showing, by clear and convincing evidence, that the custodial arrangement ... is *clearly contrary* to the child's best interest." *Id.* In keeping with the fundamental rights at stake in contested adoption proceedings, *see id.,* the focus must remain on the question of whether the party lacking the natural parents' blessing has met his or her burden to overcome the natural parents' contrary preference. Nevertheless, in this particular case, it is clear that the trial court gave extensive consideration to the merits of the mother's choice of caretaker, the Ds. In its fifty-three-page opinion, the trial court discussed in detail the fitness of the Ds as potential caretakers, but ultimately concluded that moving A.S. from her current home where she has bonded with her foster family would subject her to psychological harm. Thus, we are satisfied that the trial court gave sufficient consideration to the mother's preference. *See R.E.S., supra,* 19 A.3d at 790 (finding that "weighty consideration" standard was satisfied where "the fitness of [the birth parent's] proposed caretakers was the focal point of the trial and of the court's detailed findings of fact and conclusions of law" and "almost all of the evidence presented ... was directed toward this issue").

B. *Whether Honoring the Mother's Preference Would Be "Clearly Contrary" to the Best Interests of the Child.*

■ Having determined that the trial court gave "weighty consideration" to the mother's choice, we turn to the question of whether sufficient evidence was presented that her choice was "clearly contrary" to the best interests of the child. We have stated that "it is generally contrary to a child's best interest 'to take [her] out of a loving home, when she ha[s] lived [there] for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her.'" *R.E.S., supra,* 19 A.3d at 794 (quoting *In re An.C.,* 722 A.2d 36, 41 (D.C.1998)). We have time and again noted the "importance of stability and continuity when assessing a child's best interests," acknowledging that "'a stable and desired environment of long standing should not be lightly set aside.'" *In re T.W.M.,* 18 A.3d 815, 820 (D.C.2011) ("*T.W.M. II*") (quoting *W.E.T., supra,* 793 A.2d at 478); *see also In re L.L.,* 653 A.2d 873, 883 (D.C.1995) ("[I]t would be 'ruthless beyond description' to take a child out of a loving home, when she had lived at that home for a substantial period of time...."); *S.S. v. D.M.,* 597 A.2d 870, 883 n. 35 (D.C.1991) ("[T]he interests of the natural parent cannot overcome the interests of the child in physical and mental health and continuity of care."). With these principles in mind, we conclude that the trial court properly determined that despite C.C.'s preference, the best interests of A.S. would be served by adoption by C.M.

We recently reached a similar conclusion in *T.W.M. II, supra,* 18 A.3d at 820. There, in a contested adoption proceeding between the minor child's adult cousin and the child's current foster mother, the natural mother consented to the cousin's petition and not the foster mother's. The trial court granted the foster mother's petition and the natural parent appealed, arguing that insufficient consideration was given to her preference. Following a remand in

which we ordered the trial court to consider anew the child's adoption giving "weighty consideration" to the birth mother's preference, *see T.W.M. I, supra,* 964 A.2d at 606, we upheld the trial court's grant of the foster parent's petition. *T.W.M. II, supra,* 18 A.3d at 821. In reaching that conclusion, we noted that the trial court properly relied on undisputed evidence that—though the cousin would be a fit caregiver—the child was "securely attached" to the foster parent, and unrebutted expert testimony that removing the child from her foster mother's care could have "potentially devastating" psychological consequences for her. *Id.* Likewise, in *R.E.S., supra,* 19 A.3d at 791–93, we noted that the trial judge properly weighed the child's lack of a relationship with the proposed blood relatives, the child's clear attachment to her foster caregiver, and the child's interest in permanency in concluding that the child's best interests were served by granting the foster parent's adoption despite the birth parent's objection. In reviewing the birth parent's claims on appeal, we stated that "[t]he absence of attachment to a birth parent and his blood relatives is particularly relevant when compared to the loving bond that had been established" between the child and the foster parents. *Id.* at 791.[8] We also approved of the trial court's reliance on the fact the child "had been in foster care and numerous placements for years without permanency," noting that

these are "precisely the sort of questions this court has considered when resolving similar claims." *R.E.S., supra,* 19 A.3d at 791, 793.

Applying these precedents to the facts before us, we are satisfied that the trial court appropriately found that honoring C.C.'s choice would be clearly contrary to A.S.'s best interests because she had already been moved three times in her short lifetime and doctors and social workers testified that moving the child once more to an unfamiliar environment and breaking her secure and loving bond with C.M. would create a significant risk of psychological harm to her. The unrebutted evidence showed that A.S. was thriving in C.M.'s care and, as we noted in *T.W.M. II,* the child enjoyed a parent-child relationship with her foster parent. The trial court acknowledged that while the evidence showed that the Ds could be fit caregivers for A.S., the establishment of a secure bond with them was entirely speculative on this record, and, even if such a bond were possible, the process of establishing it would necessarily uproot the child once more, jeopardizing her interests in stability and permanency. *See R.E.S., supra,* 19 A.3d at 793 (citing *T.M., supra,* 665 A.2d at 951–52 (approving of the "trial judge's concern that uprooting child from her 'home and family of three years and plac[ing] her with an aunt with whom she has had little contact' in the hope that some day her mother could resume caring

---

8. *See also In re B.J.,* 917 A.2d 86, 94 (D.C. 2007) ("[P]lacement with a non-relative is clearly in the best interests of the children since they do not at this time have a substantial bond with any family members."); *A.T.A., supra,* 910 A.2d at 294–97 (affirming grant of adoption by foster mother despite parent's preference for relative's adoption petition where children had lived with foster mother for about a year before relative met children or filed competing petition); *Ja.J., supra,* 814 A.2d at 924 (finding no error in the trial court's declining to remove children from foster care and place them with mother's preferred caretakers where caretakers "had no relationship with [the boys] and had not seen them for several years"); *An.C., supra,* 722 A.2d at 40–41 (finding it in children's best interests for foster mother to adopt them, rather than placing them with father's chosen caregiver, where children had bonded with foster mother for nearly two years); *In re T.M.,* 665 A.2d 950, 952 (D.C.1995).

'for her would be contrary to her interests in continuity of care and caretakers and [would] defeat [her] well-founded integration into the stable [ ] home she currently enjoys'")). Experts testified that transitioning A.S. successfully into the Ds' home would require a long time and intensive support, and that the risk of psychological harm to A.S. would persist even if the transition were done properly. Thus, the evidence presented below was sufficient to establish a "firm belief" on the part of the trial court that placing A.S. with the Ds, in accordance with C.C.'s choice, would be clearly contrary to her best interests. *See W.E.T., supra,* 793 A.2d at 478. Given that finding, and given the fact that C.M.'s petition satisfied all of the factors we require the trial court to consider in granting an adoption,[9] we conclude that the trial court did not abuse its discretion in granting C.M.'s petition and denying the Ds.

C. *Appellants' Arguments Regarding the Fairness of the Proceedings.*

 We note that, given the adversarial aspect of these proceedings, the circumstances of this case seemingly placed the Ds at a disadvantage. A.S. had already been living with C.M. for several months at the time of the Ds' petition—as is likely true in many similar cases involving children in the foster system—which gave C.M. ample time to bond with the child. Appellants argue that they were prejudiced by the relatively short amount of time the Ds were allowed to spend with A.S. in order to explore whether the child would also bond with them. They contend

that this unfairness violates the "presumption" that the trial court must afford the mother's choice of caregiver.

In the interest of fairness, it may be advisable for the trial court to allow each side in a contested adoption, such as this one, due opportunity to establish an adequate basis for its petition. Notwithstanding, in reviewing appellants' claim of prejudice, "we cannot 'lose sight of the principle that governs in this context—the best interest of the child.'" *R.E.S., supra,* 19 A.3d at 794 (citation omitted); *see In re C.A.B.,* 4 A.3d 890, 899 (D.C.2010) ("[I]t is the child's best interest, not the fundamental right to parent, that is paramount in adoption cases."); *In re M.L.P.,* 936 A.2d 316, 321 (D.C.2007) (Even where we are asked to evaluate whether a parent's rights were violated, "in matters affecting the future of a minor child, the best interest of the child is the decisive consideration."); *L.L., supra,* 653 A.2d at 882 (quotations omitted) ("[T]he overriding consideration is the best interest of the child, which may compel the [trial court to] terminate parental rights regardless of the defaults of public agencies in seeking reunification of the family."); *In re A.B.E.,* 564 A.2d 751, 754 (D.C.1989) ("The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling."). While we cannot charge the blood relatives with "c[oming] too late" with a willing adoptive placement for A.S. as we have done in other cases, *see An.C., supra,* 722 A.2d at 41,[10] we cannot count the

---

9. *See* D.C.Code § 16–2353(b) (2001). The evidence was undisputed that remaining with C.M. would serve A.S.'s interest in continuity of care, that A.S. was thriving in C.M.'s care, and that A.S. was securely bonded with C.M. The trial court did not solicit the child's opinion due to her young age, but the child's *guardian ad litem* supported C.M.'s petition.

Further, the trial court noted that no evidence of drug use existed in either home, although C.C. had struggled with drug abuse in her past.

10. We decline to apply the principle that a biological parent's choice of related caretakers should not be afforded the same weighty

alleged inefficiencies of the agency in their favor, either. Where an adoption is "demonstrably in the child's interest," the child "cannot be punished for the alleged wrongs of the bureaucracy." *L.L., supra,* 653 A.2d at 882. Thus, the interests of natural and potential adoptive parents "must give way before the child's best interests." *In re A.B.E., supra,* 564 A.2d at 755. It could not be helped that by the time the Ds began exploring the possibility of adopting A.S., regardless of any blame to be placed on the agency or the blood relatives themselves, the bonding between A.S. and C.M. was already "a fact of life." *In re R.E.S., supra,* 19 A.3d at 791 (quotation omitted). Accordingly, faced with the very real question of the current placement of A.S., the trial judge did not err in considering the facts as they were, not as they may have been were the circumstances more favorable to the Ds.[11] And, as we discussed, those facts established a sufficient basis upon which to conclude that placement with the Ds would be clearly contrary to the best interests of the child.

---

consideration where the neglected child had been in the custody of foster care for a considerable length of time before the biological parent demonstrated any interest in exploring possible familial placement options. *See An. C., supra,* 722 A.2d at 40–41; *A.T.A., supra,* 910 A.2d at 297. In *An.C., supra,* upon which the trial court relied, the neglected children had lived with their foster mother for two years before the biological father suggested that the children be placed with their paternal grandmother. Similarly, in *A.T.A., supra,* the children had been in foster care for two years before the family members filed for adoption. In *An.C., supra,* we held that the birth parent's suggestion "came too late" to be afforded weighty consideration. 722 A.2d at 41. Conversely, in *A.T.A., supra,* we found that because "the record d[id] not indicate that [the birth parent] was derelict in exploring family members who could be potential caretakers, ... it [was] unnecessary to decide the extent to which our holding in *In re An.C.*

## IV. CONCLUSION

Accordingly, the decision below is *affirmed.*

*So ordered.*

---

[wa]s applicable." 910 A.2d at 297 n. 4. Here, because the trial court did not find that the birth parents were derelict in locating other family members to adopt the child—in fact, the birth mother was unaware of her father's identity until only a few months before C.M. filed her adoption petition—we conclude similarly to the panel in *A.T.A.* that the birth mother's choice should have been entitled to weighty consideration.

11. Granting appellants relief based on this argument would sponsor the "wait and see" approach which we have rejected in other cases. *See R.E.S., supra,* 19 A.3d at 793 n. 9 (quoting *In re J.G.,* 831 A.2d 992, 1001 (D.C. 2003)) ("The 'wait and see' approach of 'indefinitely deferring adoption or termination of parental rights [leaving a child in 'legal limbo' for the foreseeable future] is inappropriate where [the likelihood of a different option succeeding] within a reasonable time is entirely speculative.' ").