In re Petition of T.W.M.; A.E., S.E., and T.B., Appellants.

Nos. 10–FS–17, 10–FS–867, 10–FS–882, 10–FS–920, 10–FS–966.

District of Columbia Court of Appeals.

Argued Jan. 19, 2011.
Decided April 28, 2011.

---

Leslie J. Susskind, for appellant A.E.

Larry B. Blackwood, Guardian Ad Litem, for T.E.

Sabine Browne, Kew Gardens, NY, for appellant S.E.

N. Kate Deshler Gould, for appellant T.B.

James Tartal, with whom Sanya Sukduang, Washington, DC, was on the brief, for appellee T.W.M.

Peter J. Nickles, with whom Todd S. Kim and Donna M. Murasky, filed a state-

ment in lieu of brief, for the District of Columbia.

Before GLICKMAN, KRAMER and BLACKBURNE–RIGSBY, Associate Judges.

PER CURIAM:

We have previously had occasion to address this case in *In re T.W.M.*, 964 A.2d 595 (D.C.2009), where we vacated the trial court's order which granted T.W.M.'s petition to adopt T.E., her foster child, and denied A.E.'s competing adoption petition over the objection of S.E. and T.B., T.E.'s birth parents. Finding that the trial court failed to give appropriate consideration to the birth parents' preference to have A.E. (S.E.'s cousin) adopt T.E., we remanded to the trial court with explicit instructions to "determine anew whether T.B. and S.E. ... [were] withholding their consent contrary to the best interests of T.E." *Id.* at 606. After a new trial presided over by a new judge, the trial court again granted T.W.M.'s adoption petition and denied A.E.'s petition. A.E. now appeals the trial court's order denying her petition to adopt T.E. and granting the competing petition of T.W.M. T.B. and S.E. also submitted briefs in support of A.E., whose adoption petition they had supported. T.E.'s guardian ad litem (GAL) also filed a brief in support of A.E.'s adoption petition. The parties claim that the trial court erred when it found, by clear and convincing evidence, that the adoption of T.E. by A.E. would be contrary to T.E.'s best interests, and that it erred by failing to consider T.E.'s opinion of her own best interests. For the reasons below, we affirm.[1]

## I. Factual Background

### A. Background

Because the facts of the case are set out in detail in our first opinion, *id.* at 597–601, we briefly recount the most pertinent facts here. T.E. was born to T.B. (father) and S.E. (mother) on October 9, 2001. T.E. was placed in foster care on November 29, 2001, after her mother left her at the hospital. S.E. stipulated to neglect in January of 2002, and T.E. was placed in S.E.'s protective supervision while S.E. participated in a drug treatment program. In October of 2002, S.E. absconded from the program and left T.E. behind. After a brief placement with her maternal aunt, who was also caring for several of T.E.'s siblings, T.E. was placed in foster care with T.W.M. on November 21, 2002. *Id.* at 598.

Shortly thereafter, A.E., S.E.'s cousin, contacted the Child and Family Services Agency (CFSA) about getting custody of T.E. A.E. began supervised visits with T.E. on January 18, 2003, and was permitted unsupervised, overnight weekend visits starting May 5, 2003. In late 2003, T.B. and S.E. each formally consented to the adoption of T.E. by A.E. and T.W.M. filed a competing adoption petition. *Id.* at 598–99.

With the exception of a few-month period during which T.W.M. was deployed overseas, T.E. resided with her from November 2002 until May 2005. In May 2005, T.E. was removed from T.W.M.'s home due to a "hair incident" and placed with a different foster home. *Id.* at 599. "On May 19, 2006, after the trial conclud-

---

1. A.E., T.B. and S.E., also claim that the trial court failed to remain impartial during the trial and cite numerous instances which they believe support their claim. After our review of the record, we believe that the trial court "did not display impermissible hostility and bias toward [A.E., T.B. or S.E.]." *In re L.D.H.*, 776 A.2d 570, 574 (D.C.2001). Based on the totality of the trial transcript, we do not think that " 'the impartiality of the judge might reasonably be questioned.' " *Id.* (quoting *In re J.A.*, 601 A.2d 69, 78 (D.C.1991)).

ed, the trial court ordered CFSA to place T.E. with T.W.M. and to terminate contact between A.E. and T.E." *Id.* at 600. On November 22, 2006, the trial court entered its order granting T.W.M.'s adoption petition and denying A.E.'s petition.

### B. The First Appeal

T.E.'s birth parents, S.E. and T.B., appealed the trial court's order. A.E. did not appeal. After review, we held that the trial court erred by granting T.W.M.'s petition and denying A.E.'s petition because the trial court did not give weighty consideration to S.E. and T.B.'s choice of A.E. as adoptive parent. *Id.* at 603. "[I]n a case where there are competing petitions for placement of a child and one of the petitioners is favored by the natural parent, the party without the parent's consent has the burden of establishing by clear and convincing evidence that placing the child with the parent's preferred caregiver is contrary to the child's best interest." *Id.* at 604. We also held that the trial court abused its discretion when it found that A.E. would not be a fit caregiver. *Id.* at 603–04. We vacated the trial court's order and instructed the trial court to "determine anew whether T.B. and S.E. ... [were] withholding their consent against the best interest of T.E." *Id.* at 606.

### C. 2009 Trial

After we issued our ruling in *T.W.M.*, T.E. continued to reside with T.W.M. and that placement remains undisturbed. Thus, T.E. has been continuously residing with T.W.M. since April 2006. A.E. was again granted supervised visitation with T.E., which then became unsupervised overnight visits every other weekend in July 2009. The trial court conducted ten days of evidentiary hearings, spanning from September 21, 2010 through November 3, 2010. "T.W.M. proffered six witnesses, in-

cluding an expert; A.E. proffered seven witnesses, including an expert; the District of Columbia proffered two witnesses, including an expert; S.E., the birth mother, testified on her own behalf; T.B., the birth father, testified on his own behalf; and the guardian ad litem called no witnesses but actively participated in the examination of witnesses." The court noted that, as in the first trial, T.E.'s natural parents, her GAL, the District and A.E. supported adoption by A.E. while T.W.M. "stood alone."

The trial court exhaustively summarized the testimony of the witnesses in its forty-five page order. The trial court explicitly stated that it gave "weighty consideration to the birth parents' preference for A.E.," and it found that A.E. would be a fit caregiver. However, based largely on the facts that T.E. had been cared for by T.W.M. for all but two years of the girl's life, and that in T.W.M.'s care T.E. has "thrived and become a happy, well adjusted child," and based on the expert testimony of Dr. Missar, the court concluded that clear and convincing evidence demonstrated that the adoption of T.E. by A.E. would be contrary to T.E.'s best interests. The trial court concluded that "it would be devastating to T.E. to take her from T.W.M."

## II. Standard of Review

■ " 'We review the trial court's order granting adoption for abuse of discretion, and determine whether the trial court exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.' " *T.W.M., supra,* 964 A.2d at 601 (quoting *In re T.J.,* 666 A.2d 1, 10 (D.C.1995)); *see also In re C.A.B.,* 4 A.3d 890, 899–900 (D.C. 2010) (quoting *In re S.M.,* 985 A.2d 413, 418 (D.C.2009)). "In that review, we assess whether the trial court applied the correct standard of proof, and then evalu-

ate whether its decision is 'supported by substantial reasoning drawn from a firm factual foundation in the record.' " *T.W.M., supra,* 964 A.2d at 601 (quoting *In re T.J., supra,* 666 A.2d at 10).

## III. Legal Analysis

### A. Weighty Consideration to Parents' Choice

█ " 'Where the parents have unequivocally exercised their right to designate a custodian, [ ] the court can terminate the parents' right to choose only if the court finds by clear and convincing evidence that the placement selected by the parents is clearly not in the child's best interest[.]' " [2] *T.W.M., supra,* 964 A.2d at 604 (quoting *T.J., supra,* 666 A.2d at 16) (alterations in original); *see also C.A.B., supra,* 4 A.3d at 900; *In re A.T.A.,* 910 A.2d 293, 295 (D.C. 2006); D.C.Code § 16–304(a), (b)(2)(A), (e) (2001). "[A] determination as to whether the natural parents are withholding consent contrary to the best interests of the child pursuant to D.C.Code § 16–304(e) requires weighing the factors considered in termination of parental rights proceedings pursuant to D.C.Code § 16–2353(b) (2001)." [3] *In re P.S.,* 797 A.2d 1219, 1223 (D.C.2001); *see also In re F.W.,* 870 A.2d

82, 85 (D.C.2005) ("In making its determination, the trial court must weigh the same factors as those weighed in a termination of parental rights proceeding."); *A.T.A., supra,* 910 A.2d at 295; *In re D.H.,* 917 A.2d 112, 117 (D.C.2007). "[W]e recognize that the best interests standard 'is flexible and not susceptible to ready definition; it must of necessity contain certain imprecision and elasticity.' " *In re J.D.W.,* 711 A.2d 826, 832 (D.C.1998) (quoting *In re D.R.M.,* 570 A.2d 796, 803 (D.C.1990)). "The trial judge has wide latitude in applying the statutory criteria set forth in Section 16–2353(b)." *In re A.R.,* 679 A.2d 470, 474 (D.C.1996). We also note that

> judges are not required to inventory all the evidence and explain how they weighed each evidentiary item in reaching their decisions. Sufficiency of findings is assessed in a less formalistic fashion. We examine whether the findings are detailed enough to allow a reviewing court to conclude that the decision "followed rationally" from the findings of fact, and is consistent with the requirements of the law.

*In re I.B.,* 631 A.2d 1225, 1232 (D.C.1993) (internal citations omitted).

**2.** "The standard of clear and convincing proof requires evidence that will 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re T.J., supra,* 666 A.2d at 17 n. 17.

**3.** When determining the best interests of a child, "a judge shall consider each of the following factors:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the

child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
. . .
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter;
. . ."

D.C.Code § 16–2353(b). The parties agree that neither factor (3A) (abandonment of the child at a hospital within 10 days of birth), nor factor (5) (drug-related activity) is relevant to this appeal.

■ T.B., and S.E., T.E.'s biological parents, and A.E. claim the trial court erred when it found by clear and convincing evidence that T.E.'s adoption by A.E. would be contrary to T.E.'s best interests. The parties claim that the trial court's finding that removing T.E. from T.W.M. would be devastating to T.E. is not supported by the evidence presented at trial. Primarily, the parties fault the court's reliance on the testimony of Dr. Missar, who testified that removing T.E. from T.W.M. would cause significant short- and long-term damage because T.E. was securely "attached" to T.W.M.[4] We find that the trial court's decision was supported by clear and convincing evidence.

It is clear from the trial court's order that its decision was animated by the fact that T.W.M. has cared for T.E. for all but two years of her life and that the two share a close parent-child attachment. This court has previously noted the importance of stability and continuity when assessing a child's best interests. We have stated that " 'a stable and desired environment of long standing should not be lightly set aside.' " *In re W.E.T.*, 793 A.2d 471, 478 (D.C.2002) (quoting *Rutledge v. Harris*, 263 A.2d 256, 257–58 (D.C.1970)); *see also S.S. v. D.M.*, 597 A.2d 870, 883 n. 35 (D.C.1991) ("[T]he interests of the natural parent cannot overcome the interests of the child in physical and mental health and continuity of care."). "[I]t would be 'ruthless beyond description' to take a child out of a loving home, when she had lived at that home for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her." *In re L.L.*, 653 A.2d 873, 883 (D.C.1995); *see also Bazemore v. Davis*, 394 A.2d 1377, 1380 (D.C.1978) (noting that where a nearly five-year-old child had lived with the same caregiver for the previous two-and-a-half years, "[b]ouncing this child back and forth between [caregivers] has not and will not be healthy for her. Each time she is moved, she gets a scar and who knows whether if ever it will be healed.").

In finding that removing T.E. from such a long-standing stable environment would be devastating, the trial court relied extensively on the expert testimony of Dr. Missar. Dr. Missar testified that a secure attachment "provides the child with a solid and secure base from which . . . they can explore the world," and that T.E. had such a secure attachment with T.W.M. He testified that disrupting a secure attachment carries both short- and long-term consequences for children. In the short term, a child "goes through a period of time of emotional and behavioral regression," and that the child will grieve the loss of such a relationship. This will cause a child to experience "problems with anxiety, heightened fears, significant problems with sometimes an elevated startle response because they've essentially lost that secure base and that secure object that they came to count on." In the long-term, a child will develop "[p]roblems with trust[, p]roblems with redeveloping and making connections with others," as well as "problems with

---

4. According to the testimony of Dr. Missar, "[a]ttachment is a psychological phenomenon that begins early in a child's life whereby a child comes to see a caretaker . . . as [her] psychological parent[ ]. The psychological parent[ ] is essentially that person . . . whereby the child comes to see that individual as the person . . . on whom they count for getting their emotional needs met." Dr. Missar differentiated the "attachment" phenomenon from "bonding": "[B]onding reflects a very different phenomenon th[a]n attachment does. Attachment is that deeper emotional connection that only comes with the constancy, and the stability, and the consistency over time that I spoke of earlier. . . . [B]onding as children grow up tends to refer to the connection that a child has with other people to whom they don't have a deeper attachment."

self-esteem and self-confidence." He also stated that, from his experience, he has never known a child of T.E.'s age to experience the disruption of a secure attachment without negative consequences. In his opinion, removing T.E. from T.W.M.'s "care would have tremendous negative consequences for her both in the short and long-term" because T.E. has been "living with [T.W.M.] approximately six of the eight years of her life [and] the development of a secure attachment would have grown and deepened."

The trial court also found support for this conclusion from the testimony of A.E.'s expert, Dr. Zitner. Dr. Zitner testified that, in her opinion, T.E.'s ability to form secondary attachments was due to the strong primary attachment T.E. had with her foster mother. She noted that T.E. "expressed a lot of stress when she's been separated from her foster mother, as evidenced by the year that she lived in another foster home without the foster mother and she was sad and had tremendous difficulty during that year...." She stated that "[r]emoving a child from a home in which they have thrived [ ] for a significant period of time is something that has to be undertaken only under very, very particular, compelling circumstances and should never be considered lightly and that ... there would be serious repercussions, emotional repercussions for a child to be removed from any caretaker with whom they had been living and thriving and that one would have to do it in a very particular and appropriate way." Thus, the trial court determined that Dr. Zitner's testimony corroborated the testimony of Dr. Missar that removing T.E. from T.W.M. could potentially have devastating consequences for T.E.

■ The appellants criticize the trial court for its reliance on Dr. Missar's testimony and point to the testimony of Drs. Zitner[5] and King which they believe demonstrate that T.E. would not suffer significant harm if she were to be adopted by A.E. This argument is unavailing. The trial court, when acting as fact-finder as it was in this case, is entitled to credit the testimony of one expert witness over that of another. *See In re G.H.*, 797 A.2d 679, 683–84 (D.C.2002). " '[A]s a general proposition, when faced with conflicting expert testimony, the trial court may credit one expert over the other, or disregard both in rendering its judgment.' " *In re L.L.*, *supra*, 653 A.2d at 882–83 (quoting *Rock Creek Plaza–Woodner Ltd. v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983)). Thus, the trial court was entitled to credit and rely on the testimony of Dr. Missar. Based on the undisputed evidence that T.E. was securely attached to T.W.M. and the testimony of the experts, there was clear and convincing evidence that removing T.E. from T.W.M. and granting A.E.'s adoption petition would be contrary to T.E.'s best interests.

### B. Consideration of Child's Preference

■ A.E. and T.E.'s GAL both allege that the trial court abused its discretion by failing to consider T.E.'s opinion of her own best interests as required by statute. At the beginning of the trial, the trial court informed the parties that it would interview T.E. At the close of evidence, the trial court met with T.E. alone with the parties watching on closed circuit television. During the roughly hour-long meeting, the trial court and T.E. drew pictures, played games and chatted, but the court did not ask T.E. any of the suggested questions submitted to it by the GAL. A.E. and the GAL contend that the trial court

---

**5.** The parties dispute the import of Dr. Zit-   ner's opinions.

(1) failed to consider any evidence of T.E.'s preference, and that it (2) abused its discretion when it did not ask T.E. the questions submitted by the GAL. We disagree.

"The court was required, under D.C.Code § 16–2353(b)(4), to consider, 'to the extent feasible,' [the child's] opinion about [her] own best interests. However, while 'it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so,' 'the statute does not say the judge must derive this opinion even partly from questioning of the child' himself." *In re B.J.,* 917 A.2d 86, 92 (D.C.2007) (internal citations omitted). "Thus ... the trial court had no *per se* duty to ascertain [the child's] opinion through the child's direct testimony or statements." *Id.* " 'Indeed, common sense suggests that in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding.' " *In re J.L.,* 884 A.2d 1072, 1079–80 (D.C.2005) (quoting *In re T.W.,* 623 A.2d 116, 117 (D.C.1993)). We have differentiated between the

> judge's undoubted statutory duty to *consider* the evidence in the record relating to the child's opinion with a purported (and far more controversial) obligation to *investigate* the case on the judge's own initiative, and to create an expanded evidentiary record if the judge is dissatisfied with the record which the parties have made. The second obligation cannot be found in, or reasonably inferred from, the language of the statute. To

create such an obligation would be contrary to the normal functioning of the adversarial system....

*In re A.R., supra,* 679 A.2d at 475 (emphasis in original). Here, we find that the trial court, though it did not hear directly from T.E., did consider evidence of T.E.'s preference in reaching its decision. Given that the record contained numerous references to T.E.'s opinions and behavior relating to her relationships with her foster mother and cousin, it appears to us that "at best, appellant's assertion that the findings were inadequate refers more to the manner in which the [child]'s opinions were memorialized, rather than the judge's compliance with the statutory directive that he, 'to the extent feasible,' consider those opinions in making his ultimate determination of [her] best interests." *In re I.B., supra,* 631 A.2d at 1231.

In this instance, the trial court relied on the expert testimony of Drs. Missar, Zitner and King in assessing T.E.'s opinion of her best interest. In its order, the trial court noted that Dr. King, the only expert that was permitted to meet with T.E., testified that "T.E. did not state who she wanted to be with if she were sick or scared." Rather, "T.E. has divided loyalties," and in her ideal world she would "live in a large house with everyone, her mom, T.W.M., A.E., her biological siblings and [A.E.'s mother]." Thus, the trial court did acknowledge and consider evidence of T.E.'s preference. A.E. and the GAL direct us to evidence that T.E. preferred to stay with A.E. and claim the trial court did not consider it.[6] However, we "reiterat[e]

---

**6.** A.E. and the GAL argue that the trial court erred when it excluded T.E.'s statement to Tricia Hall, an employee of CFSA, that she wanted to live with A.E. in response to Ms. Hall's "magical question," "[i]f you had your choice of places to live with Ms. T.W.M. or Auntie A., which would you prefer to live?"

The trial court excluded T.E.'s statement on the grounds that it constituted hearsay. A.E. and the GAL contend the statement should have been admitted pursuant to the present state of mind exception to the hearsay rule. We need not address whether T.E.'s statement was properly excluded because the trial court

that judges are not required to inventory all the evidence and explain how they weighed each evidentiary item in reaching their decisions. Sufficiency of findings is assessed in a less formalistic fashion." *Id.* at 1232.

■ A.E. and the GAL also claim that the trial court abused its discretion when it met with T.E. but failed to ask any questions submitted by the GAL designed to assess T.E.'s opinion of her best interests. We hold that the trial court's decision not to question T.E. was reasonable and within its discretion. Dr. Missar stated that he believed "T.E. should not be asked who she would prefer to live with." In fact, Dr. Missar believed that, due to T.E.'s intelligence, questioning her, even using the kind of indirect questions suggested by GAL, would cause damage to her because it would either give her "some perceived degree of control" or put pressure on her not to disappoint the person she didn't choose. Likewise, Dr. Zitner stated that she "believes that it is improper to involve a child in a custody proceeding by asking the child his or her preferences." In *In re A.R.*, we found these kinds of concerns "eminently reasonable" when a trial court declined to question a child. *See supra,* 679 A.2d at 476 ("[The trial court] explained that, in her view, such an interview would place undue pressure on [the child] and would risk the infliction of significant emotional harm. The judge believed that she lacked the necessary training and skills to conduct such an interview without imperiling [the child's] psychological well-being.").

Based on the above, we find that the trial court did not abuse its discretion. It did not "state[ that] it would not consider T.E.'s expression of her opinion," as A.E. claims. Rather, the trial court noted record evidence that A.E. had expressed a desire to maintain contact with both her foster mother and biological family. The trial court also did not abuse its discretion when it refused to question T.E. about her opinion either directly or indirectly as advocated by the GAL. Though getting the child's opinion directly may be preferred, the trial court was entitled to rely on the expert testimony of Drs. Missar and Zitner that questioning A.E. could cause more harm than good. We find no error regarding this claim.

## IV. Conclusion

In sum, we hold that: (1) the trial court did not abuse its discretion when it found that the adoption of T.E. by A.E. would be contrary to T.E.'s best interests because it was supported by clear and convincing evidence; and (2) the trial court did not fail to consider T.E.'s opinion of her own best interest and it did not abuse its discretion when it chose not to question T.E. directly or indirectly about her opinion.

*Affirmed.*

alternatively held that "even if I had allowed the hearsay into the record, I wouldn't find it instructive for the reasons that were explained by Dr. Missar as to … why a child can't comprehend the question or given an answer that's truly reflective and why it's an improper question, it should not have been asked in the first place."