In re TA.L.; A.H. & T.L., Appellants.

In re A.L.; A.H. & T.L., Appellants.

In re Petition of R.W. & A.W.; A.H., T.L., & E.A., Appellants.

In re Petition of E.A., Appellant.

Nos. 11–FS–1217, 11–FS–1218, 11–FS–1255, 11–FS–1256, 11–FS–1257, 11–FS–1258, 11–FS–1259, 11–FS–1260.

District of Columbia Court of Appeals.

Argued April 9, 2013.

Decided Aug. 22, 2013.

Leslie J. Susskind and N. Kate Deshler
Gould for appellants A.H. and T.L.

Joyce Aceves–Amaya, with whom Tanya Asim Cooper was on the brief, for appellant E.A.

Melanie L. Katsur, with whom Sarah A. Wilson, Lissa M. Percopo, Washington, DC, and guardian ad litem Kelly Venci, were on the brief, for appellees R.W. and A.W.

Stacy L. Anderson, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

John C. Keeney, Jr., and Kyle J. Fiet, Legal Aid Society of the District of Columbia, and David Reiser, Washington, DC, filed a brief as amicus curiae in support of appellants T.L., A.H., and E.A.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and REID, Senior Judge.

WASHINGTON, Chief Judge:

A.H. and T.L., biological parents of minor children A.L. and Ta.L., along with the children's great aunt, E.A., challenge the trial court's decision granting the adoption of A.L. and Ta.L. by their foster parents, R.W. and A. W., and denying E.A.'s adoption petition. On appeal, A.H. and T.L. argue that the trial court erred in changing the permanency goal for the children from reunification to adoption on May 14, 2009, and that they should have been permitted to appeal the change in permanency goal at that point in the neglect proceedings. In addition, A.H., T.L., and E.A. argue that the trial court erred in granting the W.s' adoption petition because it failed to give weighty consideration to the adoption petition of the biological parents' preferred caregiver, E.A. For the reasons stated below, we reverse and remand for the trial court to give E.A.'s adoption petition the weighty consideration it is due as the petition of the biological parents' preferred caregiver.

## I. FACTS

On March 24, 2008, A.L. and Ta.L. were removed from the care and custody of their biological parents, A.H. and T.L., following the arrest and incarceration of both parents for a domestic violence incident in the family's home. The Child and Family Services Agency ("CFSA") immediately assumed custody of the children, placing them in foster care with R.W. and A.W. A.L. was sixteen months old and Ta.L. was three months old at the time. The children were both underweight, A.L. was not current on her immunizations, and Ta.L. had not seen a doctor since his discharge from the hospital after his birth. Ta.L. was diagnosed as failing to thrive, a condition characterized by being underweight due to decreased caloric intake. A.L. was found to suffer from significant medical problems, including chronic lung disease, severe asthma and sleep apnea, a severe eye disorder, and acid reflux. A.L.'s pediatrician testified that she was concerned that A.L. might not regularly be receiving the proper treatment required for these ailments, which could be life-threatening without treatment.

Two days after the children's removal from their biological parents' care, CFSA conducted a Family Team Meeting to identify family members who might provide a temporary placement for the children while A.H. and T.L. worked toward reunification. One of T.L.'s sisters, K.A.-R., attended the meeting and indicated that she would be willing to become a kinship foster care provider for the children. T.L.'s aunt, E.A., was also at the meeting and agreed to be a backup provider for K.A.-R. E.A. testified that it was her un-

derstanding that if K.A.-R.'s foster care license was denied, she would be second in line to get the children as a kinship foster care provider.

Approximately two weeks later, K.A.-R. learned that her husband did not pass the requisite background check and, as a result, she could not be licensed to care for the children in her home. K.A.-R. told E.A. that she was unable to complete the licensing process, but reassured E.A. that the children's permanency goal was reunification, which T.L. confirmed to E.A. a short time later. E.A. testified that because she understood the children's permanency goal to be reunification, she did nothing to attempt to become a placement for the children. CFSA also did not make any attempts to contact E.A. and qualify her as a kinship placement.

A.L. and Ta.L. were adjudicated neglected on May 1, 2008, because they lacked proper parental care and control and because T.L. and A.H. were unable to discharge their parental responsibilities due to their incarceration and substance abuse problems.[1] The trial court committed the children to CFSA's custody and care, with a permanency goal of reunification with the biological parents to be achieved by May 2009.

On May 14, 2009, the trial court held a permanency hearing during which the government moved to change the permanency goal from reunification to adoption on the basis that the biological parents had not been complying with court-ordered services and had thus made insufficient progress towards reunification. The trial court approved the change in permanency goal from reunification to adoption because T.L. and A.H. had not: complied with the trial court's order for drug testing or participated in drug treatment; regularly attended couples' counseling; consistently visited the children; secured stable housing; or been involved with the children's medical care and educational services.

Less than a month later, on June 12, 2009, A.W. and R.W. filed a petition to adopt Ta.L. and A.L. Shortly thereafter, E.A. was contacted by a social worker since T.L. had mentioned E.A. as a placement option for the children during the May 14, 2009 permanency hearing. E.A. began visiting the children in June or July 2009. Visits were moved to E.A.'s home in August 2009 and the children would visit with E.A. and their biological parents for one to two hours per week. E.A. testified that she requested more visits with the children, but her requests were denied.

On October 9, 2009, E.A. filed a petition to adopt A.L. and Ta.L. At a permanency hearing held on November 6, 2009, A.H. and T.L. indicated they were consenting to E.A.'s adoption petition and that it was in the best interest of the children to be adopted by E.A. rather than be returned to their care. E.A. began taking foster care classes in November 2009, and became a licensed therapeutic foster care provider in December 2009. An adoption social worker deemed E.A.'s home appropriate for children. CFSA, however, supported A.W. and R.W.'s petition citing the foster parents' ability to provide a stable home and meet all of the children's daily and medical needs, the children's bond with the W.s, and the biological parents' failure to do what was necessary to achieve reunification.

The adoption trial was held in May 2011. At the time of the adoption trial, the children had been in R.W. and A.W.'s care for three uninterrupted years. During the adoption proceeding, the W.s called psychologist Dr. James Venza as an expert

1. D.C.Code § 16–2301(9)(A)(ii)–(iii) (2001).

witness. Dr. Venza conducted an attachment study between the W.s and the children in March 2010, when A.L. was three and Ta.L. was two. The children had been with the W.s for two years at that point, and had been visiting E.A. weekly for approximately nine months. Dr. Venza concluded that A.L. has a secure attachment to A.W., which is the optimal level of development, and that Ta.L. has an anxious avoidant attachment to A.W., due in part to his age. Dr. Venza noted substantial growth in the children's cognitive abilities while in the W.s' care and predicted the children would regress cognitively if separated from the W.s. Dr. Venza concluded that the impact of removing the children from the W.s' care would be potentially "devastating" to their long-term development, particularly given their early history of neglect, medical challenges, and developmental delays, and that the risk of permanent or irreparable harm was "clear" and "unmistakable." Dr. Venza also concluded that the impact of the children's separation from the W.s would not differ based on where they were subsequently placed. Dr. Venza did not, however, study A.L. and Ta.L.'s attachment to E.A.

Dr. Sheryl Frank, a consulting psychologist with the Department of Mental Health's Assessment Center, testified about a court-ordered bonding study she performed in July 2010 between the children, the biological parents, and all the petitioners. Dr. Frank testified that the children's relationship with their biological family was positive and that E.A. ably directed the children's play, set appropriate limits, had a nice manner with the children, and was attuned to their needs. However, Dr. Frank concluded that A.L. and Ta.L. were "most attached" to the W.s and would suffer the greatest harm, in both the short- and long-term, if that bond were broken, notably the children's "emo-tional and behavioral development" were at a "high risk of derailment."

E.A. called clinical psychologist Dr. David Missar as her expert witness to offer a critique of Dr. Venza's and Dr. Frank's assessments. Dr. Missar opined that Dr. Frank was not in a position to offer an opinion about the children's attachment to any party because she had only conducted an assessment of their bonding. As for Dr. Venza's evaluation, Dr. Missar found the primary limitation to be that he did not assess the children's attachment to their biological family, including E.A.

On August 31, 2011, the trial court granted A.W. and R.W.'s adoption petition over E.A.'s adoption petition. The trial court stated that it gave "weighty consideration" to the biological parents' preference for E.A. adopting A.L. and Ta.L., but that evidence presented at trial clearly established that the children's primary attachments were to the W.s, not E.A. The trial court concluded that given the limited time the children had spent with E.A. and their birth parents in the past three years, it was "inconceivable that the children [had] meaningful attachments to any of them." Based on the three experts' testimony, the trial court found that a disruption of the attachments would pose a significant risk that all or most of the progress of the past three-plus years would be lost and that the children would regress to their pre-removal developmental trajectories. Although the trial court found E.A. to be a "forceful, healthy, and competent person" and stated that it "[did] not doubt her fitness as a caretaker for Ta.L. and A.L.," the trial court found the risk to the children's progress too great if the continuity of care provided by the W.s and the children's attachment to the W.s was not maintained. The trial court concluded that T.L. and A.H. were

withholding their consent to adoption by the W.s contrary to the children's best interests and that placement of the children with E.A. was clearly not in the children's best interests.

## II. LEGAL STANDARDS

 In the case of a contested adoption in which the biological parents have consented to adoption by one of the petitioners, "before rejecting the designated custodian's petition and severing the child's relation with his parent . . . and other relatives . . . the trial court must find by clear and convincing evidence both that the custody arrangement chosen by the [parents] would clearly not be in the best interest of the child and that the parent[s'] consent to adoption is withheld contrary to the child's best interest." *In re T.J.*, 666 A.2d 1, 11 (D.C.1995) (citing *In re J.S.R.*, 374 A.2d 860, 864 (D.C.1977)). When biological parents whose parental rights are still intact exercise their right to designate a custodian, their choice " 'must be given *weighty consideration*,' and may 'be overcome only by a showing, by clear and convincing evidence,' that the parent[s'] choice of custodian 'is *clearly contrary* to the child's best interest.' " *In re K.D.*, 26 A.3d 772, 777 (D.C.2011) (quoting *In re T.W.M.*, 964 A.2d 595, 602 (D.C. 2009)) (emphasis in original). "Clear and convincing evidence is evidence 'which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *In re W.E.T.*, 793 A.2d 471, 478 n. 15 (D.C.2002) (internal citation omitted). The non-favored petitioner bears the burden of establishing that placing the children with the parents' preferred caregiver would be clearly contrary to the children's best interest. *In re T.W.M.*, 964 A.2d at 604 (citing *In re T.J.*, 666 A.2d at 16). "If the trial court has not given sufficient consideration to the [biological] parent[s'] choice . . . we have generally reversed the trial court's decision." *In re A.T.A.*, 910 A.2d 293, 297 (D.C.2006).

 "We review the trial court's order granting an adoption for abuse of discretion, and determine whether the trial court 'exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.' " *In re T.W.M.*, 964 A.2d at 601 (quoting *In re T.J.*, 666 A.2d at 10). "We then evaluate whether the trial court's decision is supported by substantial reasoning, . . . drawn from a firm factual foundation in the record." *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C.1985) (quoting *In re R.M.G.*, 454 A.2d 776, 790 (D.C.1982)).

## III. ANALYSIS

### A. Appellants' Arguments Regarding the Fairness of the Permanency Hearing Changing the Permanency Goal to Adoption

 Appellants A.H. and T.L. first argue that their due process rights were violated during the May 14, 2009 permanency hearing in which A.L. and Ta.L.'s permanency goal was changed from reunification to adoption. Specifically, appellants argue that they did not receive proper notice of the government's intention to request a change in the permanency goal to adoption during the May 14 hearing, and that their due process rights were violated because the trial court did not hold an evidentiary hearing nor allow direct or cross-examination so they could challenge the government's assertion that there was a legitimate basis for its recommendation of adoption.

While it is preferable for the government to provide notice to the parties in advance of a scheduled permanency hearing that they intend to seek to change the permanency goal then in effect, we are

satisfied that appellants' due process rights were not violated by the government's alleged failure to do so[2] because the parties, who had been given notice of the hearing, were aware, based on the very nature of the proceeding, that a possibility existed that the court or the government would seek a change in the permanency goal because such an assessment is the purpose of a permanency hearing. In this case, the record indicates that appellants were present and represented by counsel at the January 27, 2009 permanency hearing where they were told that they had not made sufficient progress towards reunification to warrant the trial court returning their children to their custody and care. They were also given notice that there would be another permanency hearing on May 14, 2009, for the court to assess whether they were making sufficient progress to warrant keeping reunification as a goal of the neglect proceeding. For these reasons, we are satisfied that appellants' due process rights were not violated due to inadequate notice.

█ In addition, the trial court was not required to conduct a full formal evidentiary hearing when it changed the permanency goal from reunification to adoption. The regulations governing permanency hearings do not require a full evidentiary hearing, *see* D.C.Code §§ 16–2316, –2323, nor has this court ever held that there is a due process right to a full evidentiary hearing when a change of goal is proposed in a permanency hearing because that decision does not actually change the legal status of the biological parents vis-à-vis

their children, but only sets the parties on a path that could lead to a decision that affects their rights. *See In re K.M.T.*, 795 A.2d 688, 690–91 (D.C.2002) (holding that a permanency planning order "merely sets goals for the children and does not affect the parents' substantive rights in any way."). Therefore, because a change in the permanency goal for a child does not implicate a parent's fundamental rights, a trial-like evidentiary hearing is not constitutionally mandated before a trial court may change a child's permanency goal. *See In re D.B.*, 947 A.2d 443, 448–49 (D.C. 2008) ("The importance of the interest involved is 'a commanding factor in the determination of what process is due....'" (quoting *In re Jam.J.*, 825 A.2d 902, 915 (D.C.2003))); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *cf. In re Ko.W.*, 774 A.2d 296, 306 (D.C.2001) (holding that an evidentiary hearing was required to deny the biological father visitation rights during neglect proceedings).

### B. Ability to Appeal a Change in Permanency Goal

In addition to their due process claims, appellants A.H. and T.L. have requested that this panel overturn our decision in *In re K.M.T.*, which held that permanency planning orders changing the goal of the proceedings were not "final orders" that were appealable. Appellants, and the Legal Aid Society of the District of Columbia as *amicus curiae*, argue that appellants and future biological parents should be permitted to immediately appeal the trial court's change of a permanency goal as

---

**2.** Pursuant to D.C.Code § 16–2323(d) (2001), CFSA filed a report to the Family Court of the Superior Court ten days prior to the permanency hearing in which they recommended a change in the permanency goal at the upcoming hearing. Appellants A.H. and T.L. contend that there is nothing in the record that shows when or if CFSA's report was served

on the parties as required by Superior Court Neglect Rule 32(d). However, the burden was on appellants to make that record for our review and appellants did not raise the issue of inadequate notice during the May 14, 2009 permanency hearing. *See Cobb v. Standard Drug Co.*, 453 A.2d 110 (D.C.1982).

opposed to waiting for final disposition of the children's case by, for example, an order terminating parental rights or granting adoption. Even assuming we, as a panel, had the authority to overrule *In re K.M.T.*, this case is not the appropriate vehicle for reconsidering that precedent. There is nothing in the record to suggest that A.H. and T.L. were in substantial compliance with the trial court's order or that they were moving towards reunification in a timely fashion. Moreover, appellants are not challenging on appeal the trial court's decision that the permanency goal be changed from reunification to adoption; instead, they contend that the trial court's error was in failing to place the children in E.A.'s care at that time.[3] Further, at the November 6, 2009 permanency hearing, neither A.H. nor T.L. objected to the trial court's finding that they were unable to care for their children. Instead, A.H. and T.L. indicated that they supported E.A.'s adoption petition as being in the best interest of the children. The trial court, by changing the permanency goal to adoption, provided the impetus for CFSA to become involved in providing services to E.A. and thus effectively helped facilitate A.H. and T.L.'s goal of placing the children with E.A.[4]

## C. Whether the Trial Court Gave "Weighty Consideration" to the Biological Parents' Preferred Caregiver

Finally, appellants argue that the trial court failed to give "weighty consider-

---

**3.** In their brief, appellants A.H. and T.L. argue that "[b]y failing to consider other permanency options prior to ruling in favor of adoption, the court interfered with the parents' right to maintain their relationship with their children. Failure to consider guardianship with family relative denied the parents the opportunity to keep the children with the family."

**4.** While in this case we are satisfied that had an appeal been taken from the order changing the permanency goal from reunification to adoption there would not have been a different outcome, we recognize that there are many strong policy justifications for allowing an appeal at this earlier stage of a neglect proceeding. These strong policy considerations were raised as part of a compelling case made by the Legal Aid Society in its *amicus* brief that this court should revisit and reconsider its policy against allowing an appeal from an order changing the permanency goal in a neglect case. Their primary argument is that our case law holding that a parent's substantive rights are not implicated by such a change fails to recognize that once the goal is changed from reunification to adoption, the focus of the trial court and, more importantly the services provided by the government, effectively undermine any meaningful opportunity for the parents to reunite in the future with their children. Therefore, *amicus* argues that the permanency hearing is a critical stage of the neglect proceeding and a right to appeal at this stage is necessary in order to ensure that this court will have the opportunity to timely address alleged trial court errors that could significantly impact the ultimate outcomes in permanency cases. In addition to the arguments raised by *amicus*, we recognize that this court's decision in *In re K.M.T.* is now out of step with the overwhelming majority of our sister jurisdictions. Sixteen states allow parents to immediately appeal permanency goal changes as of right (Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Massachusetts, Montana, Nebraska, Oklahoma, Oregon, Pennsylvania, South Carolina, Vermont, Virginia, Wyoming). Twenty-six states allow for interlocutory review of permanency goal changes, either at the discretion of the appellate court or by certification of the family court (Alaska, Arkansas, Colorado, California, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Dakota, South Dakota, Tennessee, Washington, West Virginia, Wisconsin). For these reasons, we agree that in an appropriate case this court should look anew at our policy limiting appeals in neglect cases to only those orders that result in permanent placements of neglected children.

ation" to the adoption petition of E.A., the biological parents' preferred caregiver.[5] With this contention, we agree.

 Even when biological parents have not been "model parents," they have a "fundamental liberty interest . . . in the care, custody, and management of their child[ren]" and a "vital interest in preventing the irretrievable destruction of their family life." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Because of the fundamental rights at issue when biological parents, with parental rights intact, consent to an adoption petition in a contested adoption proceeding, "the trial court cannot merely weigh the competing adoption petitions against one another, as if they began in equipoise." *In re K.D.*, 26 A.3d at 778. Thus, the adoption petition of the biological parents' chosen caregiver can only be denied if it can be shown by clear and convincing evidence that placement with that caregiver is "*clearly contrary*" to the best interests of the children, rather than simply not in the children's best interests. *See In re T.W.M.*, 964 A.2d at 604–05. Although the competing petitioner need not necessarily show that the preferred petitioner is unfit in order to prevail, if the preferred caregiver is a fit custodian, the competing petitioner must present clear and convincing evidence that the custodial arrangement with the preferred petitioner is "clearly contrary" to the children's best

interests. *In re T.J.*, 666 A.2d at 11. If the petitioner preferred by the natural parents is fit and suitable, and the custodial arrangement, including the relationship the natural parents will have with the child, will not harm the child, the award of custody to the preferred caregiver is, as a matter of law, in the child's best interest. *See id.*

Although the trial court in the present case stated it was giving weighty consideration to E.A.'s adoption petition, we cannot discern from this record how that consideration was actually realized because there does not appear to be any evidence in the record that E.A. is either unfit or unsuitable to serve as the custodian for these children or that the adoption of these children by E.A. would result in a custodial arrangement and relationship with the biological parents that would be clearly contrary to A.L. and Ta.L's best interests. Instead, the trial court found that

> [E.A.] is a forceful, healthy, and competent person who has had significant success as a parent, family leader, and government employee. *Although [E.A.] would have to devise a safe way of managing the wishes of the biological parents to maintain relationships with [A.L.] and [Ta.L], the court does not doubt [E.A.'s] fitness as a caretaker for these two young and vulnerable children.*[6] (emphasis added).

---

**5.** Appellant E.A. also contends that the trial court erred in not considering the District of Columbia's failure to pursue a family placement with E.A. after it was determined that T.L.'s sister, K.A.-R. could not be certified as a family placement for A.L. and Ta.L. We have repeatedly held that a "child cannot be punished for the alleged wrongs of the bureaucracy." *In re L.L.*, 653 A.2d 873, 882 (D.C.1995) (quoting *In re L.W.*, 613 A.2d 350, 355 n. 11 (D.C.1992)) (internal quotation marks omitted). "[T]he overriding consideration is the best interest of the child . . .

regardless of the defaults of public agencies in seeking reunification of the family." *In re A.C.*, 597 A.2d 920, 925 (D.C.1991).

**6.** All of the trial court's other findings regarding E.A. were also positive and affirmed her caretaking abilities: "Evidence showed that [Am.H., A.L. and Ta.L's half-brother] has done very well in [E.A.'s] care"; "The children are excited to see [E.A.] when they arrive for the visits, and the children's interactions with [E.A.] during the visits are appropriate and positive . . . [E.A.] ably directs the children's play, sets appropriate limits,

The trial court found nothing about E.A. that made her an unsuitable caregiver. Nor did the trial court make any findings that suggested the custodial arrangement or the relationship the children would have with their biological parents were clearly contrary to the children's best interests. Nevertheless, the trial court granted the W.s' adoption petition due to the experts' testimony that the children risked short- and long-term psychological harm if their attachments to R.W. and A.W. were broken. While we appreciate the significance of this testimony to the trial court, Dr. Venza's attachment study, upon which the trial court primarily relied, did nothing to undermine the presumption favoring the natural parent's choice of a caregiver because the attachment study did not evaluate the children's attachment to E.A.[7] As a result, there is no evidence that the children were not attached to E.A., that they would not be able to form attachments to E.A.,[8] or that E.A. would not be able to help the children transition to her home and care. Instead, the trial court granted R.W. and A.W.'s adoption petition simply because of the potential harm the children would experience in being separated from their foster parents of three years. This analysis fails to give the biological parents' preferred caregiver weighty consideration because the analysis completely ignores the qualities of the particular person the biological parents have selected and doesn't force the court to grapple with determining whether there is clear and convincing evidence that the proposed custodial arrangement, including the relationship between the natural parents and the children, would be clearly detrimental to the best interests of the children. Instead, the trial court evaluated which placement was least likely to harm the children in the absolute, effectively placing E.A. and the W.s' petitions in equipoise.

■ If such evidence were sufficient, nearly all neglected children would remain with their foster parents against their biological parents' interests, undermining the "weighty consideration" requirement. *See In re T.J.*, 666 A.2d at 13 ("[T]ies of affection which exist between a child and a person who has had custody of the child *must yield to the desires of the parents to raise the child in a fit environment.*" (quoting *Freeman v. Chaplic*, 388 Mass. 398, 446 N.E.2d 1369, 1376 (1983)) (emphasis in original) (internal quotation marks omitted)); *In re T.M.*, 665 A.2d 950, 958 (D.C.1995) (Mack, J., dissenting) ("[R]outine emphasis on parental bonding and continuity of care creates the significant

---

has a nice manner with the children, and is attuned to their needs."

7. The trial court also relied on testimony by Dr. Frank that breaking the children's attachment to the W.s would be harmful to the children, despite the fact that the bonding study Dr. Frank performed evaluating the children's relationship with the W.s and E.A. found that the children had positive interactions with E.A., were excited to see her, were comfortable with her, and that E.A. had a nice and appropriate manner with them. The trial court's reliance on Dr. Frank's testimony is reflective of its misunderstanding of the burden of proof on the non-preferred petitioners because Dr. Frank offered no testimony about the ability of the children to form an attachment to E.A. Thus, Dr. Frank's study also does not offer clear and convincing evidence that the children's placement with E.A., the biological parents' preferred caregiver, was clearly contrary to the children's best interests.

8. As Dr. Venza himself testified, attachment is a dynamic process, and children can have attachments to several people at once. However, contrary to Dr. Venza's testimony, the trial court concluded that it was "inconceivable that the children had meaningful attachments to [E.A.]" given the limited time the children had spent with E.A. in the past three years.

risks of ... institutional bias in favor of adoption by foster parents...."). Consequently, when a trial court finds a preferred caregiver to be a fit and suitable caregiver, a trial court can rely on an attachment or bonding study to find that the weighty consideration has been overcome only if the preferred caregiver has also been given the opportunity to have a meaningful attachment or bonding study conducted between him or herself and the children, and the study concludes that an appropriate attachment or bond with the preferred caregiver has not or is not likely to occur. Under those circumstances, and absent other compelling evidence to the contrary, a meaningful attachment or bonding study by itself may provide clear and convincing evidence that the custodial arrangement envisioned by the biological parents is contrary to the best interests of a child and that the competing petitioner's attachment or bond to the child is strong.

 A meaningful attachment or bonding study is a study that is conducted after the preferred caregiver has been given time to form an attachment or bond with the children. *See In re K.D.*, 26 A.3d at 781 (explaining, in dicta, that "[i]n the interest of fairness, it may be advisable for the trial court to allow each side in a contested adoption ... due opportunity to establish an adequate basis for its petition."). Whether a preferred caregiver has failed to seize the opportunity to form an attachment or bond with the children is a relevant consideration in determining whether time must be given before conducting an attachment or bonding study. *See In re An.C.*, 722 A.2d 36, 41 (D.C.1998) (holding that a father's suggestion that the children be placed with their paternal grandmother two years after starting to live with their foster mother "came far too late" and should not be afforded the same weighty consideration). Moreover, there

may be times when a meaningful attachment or bonding study cannot be conducted because it is impossible or unadvisable to create conditions for attachment or bonding. *See In re K.D.*, 26 A.3d at 780 (relying on one-sided bonding study where preferred caregiver lived across the country and was completely unfamiliar to the child because "the process of establishing [a bond] would necessarily uproot the child once more," after having moved three times in four years); *In re T.W.M.*, 18 A.3d 815, 821 (D.C.2011) (relying on one-sided bonding study where the child had lived with the foster parent six of the eight years of her life making it impossible to replicate that bonding). In those cases, it would be proper for a court to rely on a one-sided attachment or bonding study.

Here, the trial court primarily relied on Dr. Venza's one-sided attachment study even though there was no impediment to conducting a meaningful attachment study involving E.A. and the children. E.A. was known to the children, she was visiting the children on a regular basis, and visits with her for longer or more regular periods of time could have been arranged without having to bring the children into an unfamiliar environment. Even the one bonding study that was conducted of all potential caregivers was conducted after the children had been living with the W.s for two years, while E.A. had only been able to see the children for one to two hours a week for approximately nine months. As with the attachment study, the results of a bonding study that is so disparate in terms of bonding opportunities between a preferred petitioner and a competing petitioner cannot be sufficiently meaningful to prove by clear and convincing evidence that the preferred custodial arrangement is clearly contrary to the children's best interest. In other words, without fair and equitable attachment and bonding studies, a trial court cannot find, as a matter of

law, that there is clear and convincing evidence in the record that a custodial relationship, preferred by the biological parents, with an otherwise fit and suitable caregiver would be clearly contrary to the children's best interest merely because the children are found to be attached to the competing petitioner. Consequently, we find there was insufficient evidence in this case for the trial court to conclude that E.A. is an unfit caregiver or that the biological parents' preferred custodial arrangement is detrimental to the best interests of the children. Unfortunately in this case, as in other permanency cases that require full briefing and are placed on the court's regular calendar, a significant amount of time has passed since the trial court entered its order awarding custody of the children to the W.s and therefore, we cannot say with fair assurance that the best interest of the children demands that the trial court award custody of the children to E.A. Thus, we reverse and remand this case for the trial court to give E.A.'s adoption petition the weighty consideration it is due in a manner consistent with this opinion.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court is hereby reversed and the case remanded for further proceedings in a manner consistent with this opinion.

*So ordered.*